ERNEST GALVAN – 196065
BLAKE THOMPSON – 255600
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: egalvan@rbgg.com
bthompson@rbgg.com

BRIAN A. VOGEL – 167413
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, California 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
Email: brian@bvogel.com

LANCE WEBER – Fla. Bar No. 104550*
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, Florida 33460
Telephone: (561) 360-2523
Facsimile: (866) 735-7136
Email: lweber@humanrightsdefensecenter.org

* *Pro Hac Vice* Application To Be Filed

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF VENTURA; GEOFF DEAN, GARY PENTIS, LINDA OKSNER, and RICK BARRIOS, in their individual and official capacities, DOES 1-10, in their individual and official capacities,<br><br>Defendants. | Case No. cv-14-0773 GHK (EX)<br><br>**DECLARATION OF JOHN L. CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

[1027431-6]

I, John L. Clark, declare:

1. My name is John L. Clark. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiff's Motion for Preliminary Injunction.

**My Background**

2. I am a corrections professional who has been involved in corrections for over 35 years, including 24 years at the Federal Bureau of Prisons ("FBOP"). My resume detailing my work history is attached hereto as **Exhibit A**.

3. While at FBOP, I worked in seven different facilities, including serving as the warden at both the Metropolitan Correctional Center in Miami, Florida ("MCC Miami," or the "Federal Detention Center Miami") and the United States Penitentiary in Marion, Illinois ("USP Marion").

4. From 1991 to 1997, I served as Assistant Director of FBOP, Chief of the Community Corrections and Detention Division. As assistant director, I oversaw agency policy on all detention-related issues and operations, including the coordination of the operations of all federal pretrial facilities. I regularly visited each federal detention center to review and assess operations.

5. After completing my tenure as Assistant Director at FBOP, Attorney General Janet Reno appointed me to manage a Congressionally-established agency tasked with closing the Lorton correction complex (seven prisons in total) operated by the District of Columbia, transferring its 8,000 inmates to federal custody. I managed the agency from 1997 to 2002, at which time the transfer was complete and the agency closed. During that time, my staff and I coordinated the rewriting of the agency's mail policies.

6. During this period, Attorney General Reno commissioned me to investigate and prepare a report on the infamous escape of six Washington, D.C. prisoners serving life terms in a Youngstown, Ohio prison operated by the Corrections Corporation of America. I led a team which produced a 300-page report on the escape. I also testified before committees of the U.S. House of Representatives and the D.C. City Council about our

[1027431-6]

1

DECLARATION OF JOHN L. CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

findings.

7. After completing the Lorton transfer, I worked as a management consultant for several federal agencies between 2002 and 2009, including the U.S. Marshals Service and the Office of the Federal Detention Trustee in the U.S. Department of Justice. I coordinated oversight of local detention facilities used by the Marshals Service for detaining federal pretrial prisoners. In the course of these duties, I became familiar with the operation of hundreds of local facilities with contracts to detain federal pretrial prisoners. I also visited a number of local detention facilities.

8. I have served as an expert witness on behalf of the United States of America as intervenor in *Prison Legal News v. DeWitt et al.*, Case No. 2:10-cv-02594-MBS (D. S.C.), involving the mail and correspondence policies of a local detention facility in Berkeley County, South Carolina. I also served as an expert on behalf of Prison Legal News in *Prison Legal News v. Jones et al.*, Case No. 2:11-cv-00907-JAM-DAD (E.D. Cal.), and *Prison Legal News v. Babeu et al.,* Case No. 2:11-cv-01761-GMS involving the mail and correspondence policies of local detention facilities in Sacramento County, California and Pinal County, Arizona, respectively. I am also currently serving as an expert in United States of America v. Secretary, Florida Department of Corrections, No. 1:12-cv-22958-Seitz (S.D. Fla.), a case regarding the provision of Kosher meals. Finally, I served as an expert on behalf of the United States of America, an intervenor, in *Basra v. Cate et al.*, Case No. 2:11-cv-01676-SVW-FMO (C.D. Cal.), involving a Sikh inmate penalized for refusing to trim his beard.

**Summary of My Opinions in this Matter**

9. Prison Legal News ("PLN") asked me to provide my opinion about Ventura County's refusal to deliver PLN's publications and correspondence sent to prisoners in Ventura County jail facilities. Specifically, I examined the possible effects on detention operations of allowing the delivery of the monthly journal *Prison Legal News* and envelopes containing mail from PLN, including letters, PLN's brochure packets and copies of court decisions sent to inmates. I have reviewed the mail policies and procedures of the

1  Ventura County Sheriff's Department that are at issue in this case, along with numerous
2  examples of publications and other correspondence returned to Prison Legal News by
3  mailroom personnel at the Ventura County jail facilities. I have also reviewed declarations
4  and legal briefing submitted by the county regarding the security justifications for their
5  policies.

6      10.    As described below, Ventura County's mail policies are inconsistent with
7  widely-accepted detention practice. In my thirty-five years as a corrections and detention
8  professional, I have never been associated with any correctional or detention institutions
9  that have banned such publications or correspondence. Ventura County's policies banning
10 the publications and correspondence at issue here actually make the County's jails less safe
11 by limiting written and printed materials that can assist prisoners in planning for their
12 reentry into society on release, and that can mitigate the harmful effects of idleness on a
13 detention environment. The maintenance of frequent and meaningful contact between
14 prisoners and their family and friends from their communities has a powerful impact on
15 prisoners' rehabilitation and public safety. Consistent communication with outside
16 networks serves a valid, rational connection to the penological purpose of rehabilitation
17 and for decreasing chances of recidivism.

18     **Importance of Communications from the Outside World**

19     11.    Detention professionals widely recognize that providing inmates access to
20 reading material and to meaningful communications with friends and family are essential
21 aspects of good detention management. Personal correspondence from friends and family
22 is highly valued by inmates and generally has positive overall effects on inmates, their
23 families and staff persons. Inmates who maintain family ties are less likely to adopt
24 behaviors of hardened criminals and become part of a prison subculture. This
25 communication will decrease the likelihood of inmates developing and adopting an
26 institution mentality that they would carry with them upon release. Accordingly,
27 encouraging communication between inmates and their families promotes order and
28 security in detention facilities as well as in the community. There is an increased

[1027431-6]

3

DECLARATION OF JOHN L. CLARK IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 likelihood of success upon release when there has been meaningful and consistent contact
2 with outside support networks while incarcerated. Due to the high cost of telephone calls
3 and the logistical difficulties presented by in-person visitation (scheduling conflicts,
4 transportation difficulties, long distances, etc.), letter writing is the most common form of
5 communication used by inmates. So the encouragement of meaningful contact between
6 inmates and their families and other support networks via letters promotes public safety.

7    12.    Another important aspect of encouraging consistent communication with
8 outside support networks is the mental health of the inmates. Because the inherent nature
9 of imprisonment leads to isolation, inmates may develop serious mental health issues or
10 previous mental health issues may worsen. The period when an imate is first confined in a
11 local detention facility after being arrested is an especially sensitive time for many
12 individuals, and is the time when inmates most often attempt to harm themselves.
13 Anything that helps inmates settle themselves down during such a period helps improve
14 safety in a detention facility. Increased isolation along with decreased opportunities for
15 communication with support networks can lead to psychotic breaks within and outside of
16 the prison walls. Thus, consistent communication is extremely important for the wellbeing
17 of inmates, prison staff, and the general public.

18    13.    In addition to meaningful contact with friends and family, providing mental
19 stimulation to prisoners and detainees through reading material is a valuable tool in
20 maintaining order and security within correctional facilities. Reading can play an important
21 role in maintaining prisoners' and detainees' healthy interest in and awareness of life in the
22 broader community, and in preparing them for life after confinement. The closed
23 environment of penal institutions inherently breeds boredom, frustration, and tensions
24 among inmates that can result in aggressive or disruptive behavior. For this reason,
25 providing mental stimulation is a vital aspect of good corrections management. The greater
26 an individual's access – within reasonable limits – to reading materials of various kinds,
27 the less apt he or she is to grow angry or frustrated with the idle existence of life inside
28 prisons and detention centers.

14. Access to reading material with information about the outside world is an important component of prisoners' and detainees' rehabilitation. Educational materials, newspapers, books, and magazines broaden prisoners' and detainees' ability to function in and relate to mainstream society upon their release. A recent publication of the Urban Institute's Justice Policy Center, *From the Classroom to the Community: Exploring the Role of Education during Incarceration and Reentry* (2009), noted the link between public safety and access to pro-social activities such as reading: "Research demonstrates that education can change thinking, encourage pro-social behavior, increase employment, and reduce recidivism. Education's power to transform lives in both tangible and intangible ways makes it one of the most valuable and effective tools we may have for helping people rebuild their lives after incarceration, as well as for combating crime and reducing criminal justice costs." *Id.* at 42.

**My Experience with the Federal Bureau of Prisons
and Its Mail and Correspondence Policies**

15. FBOP recognizes the integral role played by reading material in managing prisoners and detainees in a correctional setting. FBOP allows federal prisoners and detainees in each of its facilities to receive letters and access a wide variety of books, magazines, newspapers, and education materials. While FBOP controls the overall volume of reading materials an inmate may possess, it has no rules prohibiting literature that offers subscription materials, photocopies, or correspondence containing legal decisions. FBOP policy bans only material containing nudity (meaning where genitalia or female breasts are exposed) or sexually explicit materials (meaning depictions of sex acts). FBOP applies its policies on reading material to a diverse population of prisoners and pretrial detainees encompassing a wide range of security levels and presenting an array of sophisticated threats to maintaining security and good order. FBOP's network of facilities includes eleven major pretrial detention centers, most holding from 800 to 1,500 detainees, and approximately twelve somewhat smaller pretrial detention facilities. The policies described above are followed at each of FBOP's pretrial detention facilities. These detention

1 facilities serve a function on the federal level in major metropolitan areas similar to that of
2 Ventura County's jails on the local level.

3     16.    Similar to the policies of many other correctional and detention facilities in
4 the United States, FBOP's policies reflect the importance of allowing prisoners and
5 detainees to access reading material in penal settings.

6     17.    I have applied FBOP's mail policies as warden of two high profile federal
7 facilities: MCC Miami and the USP Marion Supermax facility, as well as in my later
8 capacity as the agency's Assistant Director overseeing and coordinating policy at all the
9 FBOP's pretrial facilities.

### *Metropolitan Correctional Center (Miami, Florida)*

11     18.    I served as warden of MCC for two years, from 1988 to 1989. At that time,
12 the facility housed approximately 1,000 detainees in a space designed to accommodate
13 only 400.

14     19.    Each of these detainees was charged with a federal felony. Occupants of
15 MCC Miami included many extremely violent offenders, dangerous drug dealers,
16 organized crime figures, a terrorist accused of bombing an airliner, and other notorious
17 criminals. Former Panamanian dictator Manuel Noriega was sent to the facility after his
18 seizure by the U.S. military in 1990, and remained incarcerated there for many years after
19 his conviction.

20     20.    Ensuring detainees' access to publications and correspondence has long been
21 an important component of corrections management at MCC Miami. This facility currently
22 allows inmates to receive hard cover and soft cover books, newspapers, and magazines, as
23 long as such materials are sent from a publisher, bookstore, or book club. Detainees may
24 possess up to five books and three magazines at a time. These regulations are substantially
25 similar to the mail policies in place while I was warden of MCC Miami. During that time,
26 detainees were allowed to receive letters, books, magazines, and newspapers. In fact, so
27 many detainees subscribed to the *Miami Herald* during my tenure that a delivery truck
28 made daily stops at the facility to deliver dozens of newspapers to detainees.

### *U.S. Penitentiary (Marion, Illinois)*

21. I left MCC Miami in 1989 to become Warden of USP Marion – then the highest security federal prison in the United States. USP Marion opened in 1963 as a maximum security penitentiary to replace Alcatraz and house the nation's most dangerous federal criminals. USP Marion continued to carry out this critical mission until 1993, when FBOP completed the construction of a new administrative maximum security facility in Florence, Colorado.

22. USP Marion has incarcerated some of the most inventive and violent criminals in American history, including mob bosses John Gotti and Demeco Scarfo. During my tenure as warden, USP Marion also housed the most escape-prone prisoners in federal custody.

23. During my tenure from 1989 to 1991, USP Marion permitted its prisoners to receive letters, books, newspapers, and magazines that were sent directly from publishers. Allowing USP Marion's prisoners to access such correspondence and reading material was a component of effectively managing the facility's high security population. The policy of allowing prisoners to receive letters and publications did not create any threat to the order or security of the then highest security federal prison in the United States.

### *Assistant Director over Pretrial Detention Services*

24. From 1991 to 1997 I served in Washington, D.C. on the FBOP Director's executive staff in the role of the agency's Assistant Director for Community Corrections and Detention Services.

25. In that capacity I oversaw and coordinated agency policy in all of the FBOP's pretrial facilities. These included more than 20 very secure detention centers of various sizes, such as the Metropolitan Detention Centers in Los Angeles and San Diego. Maintaining security and good order in these facilities was a challenging and complex task, as these detention centers frequently held dangerous high security prisoners who posed grave security risks during the time they were held for appearances and trial in federal courts.

26. In this position, I regularly traveled to and reviewed the security and operations of all of the federal pretrial detention facilities. I also had responsibility for coordinating the agency's thirty community field offices around the country which provided oversight for hundreds of local detention facilities with which the FBOP maintained contracts to hold federal prisoners. I also made frequent visits to inspect many of the local contract jails and centers.

27. During this six year period, it was again my ongoing experience that the FBOP's policy and practice of allowing prisoners to receive letters and publications did not create any threat to the order or security of these pretrial facilities with prisoner populations and missions similar to the Ventura detention facilities. In fact, these policies and procedures were widely viewed by agency administrators as helping to mitigate inmate idleness and to strengthen family and community ties, thereby reinforcing the facilities' good order and security.

## Ventura County's Mail Policies and Practices

*Postcard-Only Policy*

28. I have reviewed the jails' mail policy, Article 36, which limits inmates' receipt of written correspondence to postcards only. This policy is contrary to widely accepted detention practices. I have never been associated with a facility that restricted written correspondence with prisoners to the form of postcards only. Some of the most notorious criminals, housed in maximum security facilities, have less restrictive access to communication with the outside world. Permissible mail correspondence is much broader in these federal facilities than in Ventura County jails.

29. In my experience, allowing inmates to receive letters and documents in envelopes does not pose a significant threat to safety and security. Detention staff persons who work in jail mailrooms have a variety of means by which they can detect and intercept contraband that might be sent to inmates inside envelopes through the mail. These range from simple techniques such as visual and physical inspection to the use of more sophisticated tools such as x-ray machines and drug or metal detectors. Detention facilities

1  also often already use techniques such as random cell and inmate searches to detect any
2  contraband that has already entered the facility. These techniques have been successfully
3  used for decades to intercept contraband in detention facilities. Based on my experience
4  overseeing mail rooms in federal detention facilities, this process of inspecting individual
5  letters would require only a very modest amount of time each day for jail facilities the size
6  of Ventura County's.

7  30.  I have reviewed a legal brief and redacted declarations from Ventura County
8  Sheriff's Department employees in a previous case, called *In re Garcia*, where prisoners
9  had previously challenged the County's postcard policy as violating their rights. The brief
10 and declarations from Jail employees explained the justifications for their postcard policy.
11 These materials do not rationally explain why the postcard policy is needed to protect jail
12 safety and security. For example, the County's legal brief states that postage stamps have
13 historically been utilized to transmit drugs into jails, but fails to explain why this concern
14 does not apply with equal force to postage stamps attached to postcards. Similarly, one jail
15 employee, Captain Jerry Hernandez, explained that he has seen prisoners use postcards to
16 smuggle in contraband by splitting them in two, attaching the contraband, and gluing them
17 back together. This suggests that replacing letters with postcards does not effectively
18 mitigate the security risk. Another jail employee, classification deputy Aaron Wilkinson,
19 explained that gang communications are sometimes sent through the mail. Obviously,
20 these types of communications could also be sent on postcards. In general, the jails'
21 employees documented that inmates do try to smuggle in contraband in the mail, as is the
22 case at correctional and detention facilities across the county. However, they fail to explain
23 why they could not stop the contraband by inspecting the materials sent in envelopes. In
24 fact, jail employee Tracy Martinez explained that when the jail allowed enveloped
25 correspondence, she discovered contraband in incoming letters and successfully disposed
26 of all of it.

27  31.  As discussed above, rules like this postcard policy actually undermine public
28 safety by unnecessarily limiting contact with the outside world. From a security

1  perspective, this policy is short-sighted and could actually make the jails more difficult to
2  manage because, in my experience, inmates who are engaged in meaningful
3  communications with family and friends are easier for detention staff to manage.

4      32.    Such rules also undermine the maintenance of strong relationships between
5  inmates and the members of their communities (including family, friends and
6  employment/professional contacts) that can prepare them for life beyond their detention.
7  Letter writing is the most readily available and cost-effective means of communication
8  between inmates and their non-incarcerated family members. Because the physical
9  movement of inmates is severely restricted, they are unable to visit with their family
10 members frequently enough and for long enough periods of time to communicate
11 meaningfully even if their family members are physically able to visit the jail. Here, the
12 Jail's Public Information Plan states that inmates are strictly limited in their visits, in that
13 inmates are only allowed visits from two people at a time for a maximum of two thirty
14 minute periods each week. These infrequent personal visits are not an adequate substitute
15 for personal letters.

16     33.    Because incarceration often causes economic hardship on inmates and their
17 families, the use of the telephone is also an inadequate substitute for the type of
18 meaningful communication offered through the exchange of written letters. Letters can
19 wait in the mailbox all day, or for several days, before the intended recipient might be
20 available to retrieve it and read the contents. Conversely, the success of an inmate's
21 telephone call from inside a jail depends on the immediate availability of the person whom
22 he or she is trying to reach.

23     34.    This policy also limits meaningful communication because postcards
24 contain a very small amount of space on which to write a message. My experience is that
25 inmates and their correspondents typically communicate through letters that contain
26 significant amounts of information that would not fit in the space provided for writing on a
27 postcard. The nature of time spent confined in a detention center yields substantial
28 opportunity for inmates to write thoughtful, detailed letters communicating a wide variety

1  of personal information to those in their support networks on the outside. Similarly, it is
2  my experience that family members of inmates typically write letters containing multiple
3  pages of information due to the limited amount of communication available through
4  alternative means. The nature of a postcard also makes it more difficult to send typed
5  correspondence, drawings from children or family photos, as sending photos appears to be
6  prohibited under Jail policy unless the family member knows how to and can spend the
7  money to create a photo postcard. The Jail's policy limiting inmates to possessing no more
8  than twenty postcards is another unnecessary limit that further inhibits communication.

9      35.    Because postcards are less private, a postcard policy also creates additional
10 security problems because inmates can more easily read the mail of other inmates. This
11 creates the possibility that private information could be used against the inmate who
12 received the postcard, which could lead to violence or other problems. The lack of privacy
13 for postcards is also likely to discourage some friends and family members from
14 discussing private, meaningful topics for fear they will be seen by others. This undermines
15 the interest in allowing inmates to maintain meaningful relationships while incarcerated. It
16 will also inhibit private communications from people like religious leaders and mental
17 health professionals who sometimes communicate with inmates going through a difficult
18 period in their lives.

19     36.    It is my professional opinion that there is no valid, rational connection
20 between a postcard-only mail policy and any security interest.

21 *Ban on Ordering Materials*

22     37.    The materials I reviewed show that, in addition to rejecting correspondence
23 from PLN because it was not on a postcard, the Jails have also rejected PLN's book and
24 subscription order forms on the basis that inmates "cannot order anything in jail." As
25 described above, allowing inmates access to reading materials generally encourages
26 productive and pro-social behavior. Additionally, the ability to order books and other
27 materials does not impede officers' ability to promote and maintain order. I can think of no
28 legitimate reason to prohibit inmates from purchasing books and magazines that comply

with the safety and security concerns of the facility. Detention facilities control the disbursement of inmate funds and are able to monitor what types of publications inmates order. And, as noted above, detention facilities can inspect any magazine or book when it arrives at the facility.

*Ban on "Xeroxed" Copies*

38. The materials I reviewed show that certain documents sent by Prison Legal News have been rejected with the explanation of "no Xeroxed copies." The practice of jail staff persons to prohibit inmates from receiving "Xeroxed" documents sent through the mail bears no valid, rational connection to any legitimate security interest. There are many reasons why inmates would legitimately need to have photocopies of documents, including documents related to their legal matters, which would not be allowed by a policy that bans photocopied documents.

39. Prohibiting inmates from receiving documents which have been photocopied is contrary to widely accepted detention practice. Mailroom staff at detention institutions are capable of searching for contraband in envelopes containing documents that have been photocopied or "Xeroxed" in the same way that they can search the contents of envelopes containing documents that have not been photocopied. Implementation of such a rule would also necessarily be inconsistent and inaccurate, given that it would be very difficult for detention staff persons to determine whether documents are originals as opposed to photocopies.

40. There is nothing about photocopied documents that causes them to be a threat to the safety and security of a detention facility. The practice of prohibiting inmates from receiving photocopies in the mail unnecessarily prevents inmates from making productive use of their time by continuing to educate themselves while they are incarcerated by receiving materials from family and friends pertaining to particular cases and topics of interest to them.

*Rejections Based on "Suggestive" Content*

41. Although the jail's mail policy allows inmates to receive softbound books,

1 newspapers, and magazines from a publishing company or internet bookstore, the
2 materials I reviewed show that the jail has at times rejected PLN's magazine on the basis
3 that there are "suggestive" advertisements and images in the publication. After reviewing
4 several PLN magazines with the advertisements in controversy, I do not believe that they
5 rise to the level of explicitness to mandate a ban. The ads are very small, do not make up
6 even a significant portion of the magazine, and contain no nudity. Although some do
7 contain pictures, the majority of the ads contain only text.

8     42. I am not aware of any research that indicates a danger in detention settings
9 from the availability of publications with such limited sexual content. Furthermore, in my
10 experience I have not found that such material poses a danger. I have never encountered or
11 heard of a situation where the availability of these types of publications have caused
12 assaultive behavior or problematic tensions in a correctional setting involving even long-
13 term prisoners. The level of concern for potential assaults would be even less in a jail
14 setting where prisoners are generally not held for an extended period of years. In my
15 experience, sexual assaults in correctional facilities are typically motivated by a desire for
16 dominance and control more than sexual gratification. My experience is consistent with
17 that of most other career correctional administrators with whom I have spoken.

18     43. The Jails' rejection of publications like Prison Legal News with "suggestive
19 content" is inconsistent with widely accepted detention practice. In my professional
20 judgment, there is not any legitimate security interest furthered by banning publications
21 that contain sexually suggestive (but non-explicit) pictures. Banning all publications
22 containing suggestive images impedes detention management in several ways. First, such a
23 broad prohibition causes corrections staff to spend needless time and effort conducting a
24 detailed review and screening of all publications that arrive through the mail. Additionally,
25 staff must then prepare the rejected items for return mail, meticulously documenting these
26 numerous rejections in written records. Second, a prohibition on all material with even
27 mildly suggestive images would significantly limit the range of publications available for
28 detainees to receive. Such a restriction limits detainees' access to normal reading material

and could easily lead to – or enhance – boredom, frustration, and anger, which increases the risk that an inmate will create a disruption while incarcerated. Finally, preventing an inmate from educating himself about the issues of the day undermines efforts of rehabilitation and makes reentry into society more difficult. I have never encountered any security problems caused by magazines sent by legitimate outside publishers, distributors or retailers.

44. As noted above, the FBOP allows prisoners and detainees to receive publications containing sexually suggestive, non-explicit photographs. FBOP policy statements expressly provide that prisoners and detainees may receive publications such as the Sports Illustrated Swimsuit Issue and the Victoria's Secret catalog. Neither the FBOP regulations, nor any sound detention practice, attempts to enforce a vague restriction like one on "sexually suggestive" photographs. Depending on one's individual standards, almost any mainstream publication would be vulnerable to the charge of containing "sexually suggestive" images in its advertising and editorial content.

45. During my tenure as warden, neither USP Marion, MCC Miami, or any of the other FBOP detention centers had rules against publications containing sexually suggestive (but non-explicit) pictures. This policy resulted in no problems to the security or good order of those difficult to manage facilities. Currently at MCC Miami and USP Marion, pictures in publications are objectionable and prohibited only if they violate the standard set out in FBOP's agency-wide policy described above.

46. Over many years of day-to-day operational experience, FBOP to my knowledge has suffered no ill consequences of any note to the security or good order of its pretrial or prison facilities as it functioned under these policies. In my experience, publications received by prisoners and detainees pursuant to these policies have never threatened order or security.

**Summary and Conclusion**

47. In sum, based on my experience directly managing and overseeing the

1  management of correctional and detention institutions, it is my professional judgment that
2  Ventura County's policies and practices inhibit security and good order. Interference with
3  the communication between inmates and their family members causes those relationships
4  to deteriorate, increases recidivism and creates a greater likelihood that inmates become
5  alienated instead of successfully reintegrating with society at large upon their release. In
6  addition, prisoners and detainees who cannot access a reasonable amount of reading
7  material become unnecessarily idle, which can lead to boredom, frustration, and disruptive
8  behavior.

10  DATED: 12-13-13                         _____
                                             John L. Clark

# EXHIBIT A

John L. Clark   708 Hope Lane
Gaithersburg, MD 20878
301-963-9680 (H)
202-365-3958 (W/Cell)
_____

**EDUCATION**
- Master of Public Administration, Wayne State University, 1977
- Master of Arts (Theology) University of Detroit, 1972
- Theological Studies, St. John's Seminary, Plymouth, Michigan, 1965-68
- BA (Philosophy) Sacred Heart Seminary College, Detroit 1965

**RECENT PROFESSIONAL RESPONSIBILITIES:**
Criminal Justice Consultant for the following agencies, 2002 to present:
- Department of Justice, Civil Rights Division. Expert Witness (2011-2013)
- Law firm of Feldesman Tucker Leifer Fidell, LLP. Corrections Consultation (2009-2011)
- Office of the Federal Detention Trustee, U.S. Department of Justice (2002-2009)
  Served as Senior Advisor to the agency in a number of areas involving the coordination and oversight of local detention facilities used by the the U.S. Marshals Service for detaining federal pretrial prisoners.
- Superior Court, District of Columbia (2002-2009)
  Assisted the office of the Chief Judge in several areas, mostly providing coordination to various interagency detention related operations and projects.
- U.S. Marshals Service, District of Columbia (2003-2005)

**PREVIOUS PROFESSIONAL EXPERIENCE**

1997 to 2002   **Corrections Trustee for the District of Columbia**

- Appointed by Attorney General Reno to set-up and manage a Congressionally established agency to coordinate and oversee the closure of the Lorton prison complex and the movement of 8,000 prisoners to federal custody. Closed the office in 2002, having successfully completed the mission.
- Directed the agency's role as a funding and oversight vehicle for federal support of the District of Columbia's operations to hold felons in custody. Managed annual budget of over $150 million.
- Established and served as chair of the Interagency Detention Work Group in the District, set up with federal and District of Columbia Courts and 10 agencies to address a number of problems related local detention issues.
- Facilitated several other special projects to address pressing detention issues at the request of the Deputy Attorney General and Congressional authorities.

1974 to 1997   **Federal Bureau of Prisons**

[1036395-1]

    ☐    1991 to 1997: Served as Assistant Director of the agency, chief of the Community Corrections and Detention Division.

- Appointed as original division chief, setting up this newly established division, one of eight major divisions within the Bureau of Prisons. Member of Bureau's Executive Staff, the central decision-making body on policy and personnel matters.
- Oversaw agency policy on all detention related issues and operations, including the daily operation of all federal pretrial facilities. In that capacity, served as principal agency liaison with a variety of external agencies, such as the U.S. Marshals Service, the Federal Probation and Pre-Trial Service, and the Immigration and Naturalization Service. Represented the agency on the Department of Justice Detention Planning Committee.
- Coordinated a network of 30 community corrections field offices and 250 contract community corrections programs with over 6,000 offenders, as well as a number of secure contract facilities holding another 4,000 sentenced prisoners, including administration of a contract budget of $180 million.
- Directed the operations of the agency's privatization project management team in the implementation of the Bureau's initiative to significantly expand its use of privatized facilities, including planning, procurement, and oversight of privatized facilities, such as the award of a $300M 10 year contract.

    ☐    Previous positions in Bureau of Prisons from 1974 to 1991:

- Warden at a large urban pre-trial detention facility (Miami, Florida 1988-1989) and at the highest security federal penitentiary in the country (Marion, Illinois 1989-1991);
- Central Office, Chief of Correctional Programs Branch, responsible for headquarters coordination of such operations as Inmate Classification, Unit Management, Witness Protection Program, Cuban INS detention programs;
- At 5 other facilities spanning all security levels, held the following positions: Correctional Officer, Case Manager, Unit Manager, Executive Assistant, Camp Administrator.

**1994 to 1997**  ☐  Instructor (part-time), Criminal Justice Administration, Montgomery College, Rockville, Maryland

**1972-74**  ☐  Chaplain at large state psychiatric hospital, Ypsilanti, Michigan, Michigan Department of Mental Health. Part-time Chaplain, Federal Correctional Institution, Milan, Michigan

**1969-72**  ☐  Parish priest, Flint Michigan. Catholic Diocese of Lansing

## SELECTED RECENT INVOLVEMENTS

- Member, National Committee on Community Corrections
- President, Board of Directors, Visitors' Services Center (A small non-profit agency)
- Member, Board of Directors, Council for Court Excellence
- President, Bureau of Prisons Retirees' Association, DC Chapter
- Member, American Correctional Association

[1036395-1]

☐ Chair, Parish Council, St. Rose of Lima Church, Gaithersburg, Maryland