1  ERNEST GALVAN – 196065
   BLAKE THOMPSON – 255600
2  ROSEN BIEN GALVAN & GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
3  San Francisco, California  94104-1823
   Telephone:  (415) 433-6830
4  Facsimile:   (415) 433-7104
   Email:        egalvan@rbgg.com
5                bthompson@rbgg.com

6  BRIAN A. VOGEL – 167413
   THE LAW OFFICES OF BRIAN A. VOGEL, PC
7  770 County Square Drive, Suite 104
   Ventura, California  93003
8  Telephone:  (805) 654-0400
   Facsimile:   (805) 654-0326
9  Email:        brian@bvogel.com

10 LANCE WEBER – Fla. Bar No. 104550*
   HUMAN RIGHTS DEFENSE CENTER
11 P.O. Box 1151
   Lake Worth, Florida  33460
12 Telephone:  (561) 360-2523
   Facsimile:   (866) 735-7136
13 Email:        lweber@humanrightsdefensecenter.org

14 * *Pro Hac Vice* Application To Be Filed

15 Attorneys for Plaintiff

16                 UNITED STATES DISTRICT COURT

17                 CENTRAL DISTRICT OF CALIFORNIA

| 18  PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER, | Case No. cv-14-0773-GHK (EX) |
|---|---|
| 19                          Plaintiffs, | **DECLARATION OF BRIAN VOGEL IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 20  v. | |
| 21  COUNTY OF VENTURA; GEOFF DEAN, GARY PENTIS, LINDA OKSNER, and RICK BARRIOS, in their individual and official capacities, DOES 1-10, in their individual and official capacities, | Date:   March 17, 2014<br>Time:   9:30 a.m.<br>Dept.:  650<br>Judge:  Hon. George H. King |
| 22 23 24 25  Defendants. | |

[1050699-2]

1    I, Brian Vogel, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the

3 bar of this Court, and counsel of record for Plaintiff. I have personal knowledge of

4 the matters set forth herein, and if called as a witness I could competently so testify.

5 I make this declaration in support of Plaintiff's Motion For Preliminary Injunction.

6    1.    On January 17, 2013, I submitted a Public Records Act request to the

7 Ventura County Sheriff's Office to obtain a copy of the Jail's mail policies as of that

8 date. I received a response to that request on January 24, 2013. Attached as

9 **Exhibit 1** is a true and correct copy of the January 24, 2013 letter from the Ventura

10 County Sheriff's Office, as well as a true and correct copy of Article 36 – Inmate

11 Mail Guidelines, which was produced by the Sheriff's Office on that date.

12    2.    In October 2012, I obtained certain documents from the Ventura

13 County Superior Court from the *in re Garcia* case, Case No. MA-004-11. A copy of

14 the March 9, 2011 brief filed by the Defendants in that case is attached hereto as

15 **Exhibit 2**. Copies of declarations from several Ventura County Jail personnel filed

16 on November 14, 2011 are attached hereto as **Exhibit 3**.

17    3.    On January 21, 2014, I sent Steve C. Marshall, Esq., an attorney

18 employed by my office to assist me in this litigation, to speak with inmates at the

19 Ventura County Jail, Todd Road Facility in Santa Paula, CA. (*See* Declaration of

20 Steve C. Marshall, filed herewith).

21    I declare under penalty of perjury under the laws of the United States and the

22 State of California that the foregoing is true and correct, and that this declaration is

23 executed at Ventura, California this 4th day of February 2014.

24

25    *Brian Vogel*

26    Brian Vogel

27

28

# EXHIBIT 1



# VENTURA COUNTY
# SHERIFF'S OFFICE

- **GEOFF DEAN**
  Sheriff
- **GARY PENTIS**
  Assistant Sheriff
- **JOHN CROMBACH**
  Assistant Sheriff

800 SOUTH VICTORIA AVENUE, VENTURA, CA 93009   PHONE (805) 654-2380   FAX (805) 645-1391

January 24, 2013

Mr. Brian Vogel
Law Offices of Brian Vogel
770 County Square Drive Suite 104
Ventura, CA 93003

Re: Public Records Act Request

Dear Mr. Vogel:

This letter is in response to your Public Records Act request received on January 17, 2013.

1. The Sheriff's Office is producing the following documents in response to Request No. 1: Detention Services Division Policy, Article 36, Inmate Mail Guidelines; Detention Services Division Policy, Article 28, Release of Inmate Mail and Property to Investigators; Pre-Trial Detention Facility Policy, Section 9 – Chapter 2, Inmate Mail; Todd Road Jail policy, Chapter 7 – Section 5, Telephone and Mail Privileges; the Sheriff's Office Public Information Plan; training Knowledge Domain #15, Inmate Privacy and Rights; Inmate Mail Guidelines and New Postcard Guidelines taken from the Sheriff's Office website, www.vcsd.org.

2. The Sheriff's Office is producing the following documents in response to Request No. 2: Detention Services Division Policy, Article 25, Law Library and Pro Per Inmates; Pre-Trial Detention Facility Policy and Procedure, Section 9 – Chapter 3, Law Library; Todd Road Jail policy, Chapter 7 – Section 4, Legal Activities; training Knowledge Domain #15, Inmate Privacy and Rights.

3. The Sheriff's Office provides inmates with an electronic law library supplied by Lexis Nexis.  http://www.lexisnexis.com/government/agencies/prison_solutions.pdf According to the index, the law library contains the following materials:

   Deering's California Codes Annotated
   Deering's California Codes Annotated 2
   Deering's California Codes, Legislative Changes

1

☐ **SPECIAL SERVICES**
6401 Telephone Road, Suite 200
Ventura, CA 93003
(805) 477-7011 FAX (805) 477-7010

☐ **PATROL SERVICES**
2101 East Olsen Road
Thousand Oaks, CA 91362
(805) 494-8261 FAX (805) 494-8295

☐ **DETENTION SERVICES**
800 South Victoria Avenue
Ventura, CA 93009
(805) 654-2305 FAX (805) 654-3500

☐ **SUPPORT SERVICES**
800 South Victoria Avenue
Ventura, CA 93009
(805) 654-3926 FAX (805) 654-2109

California Official Reports – Case Update
California Official Reports 1
California Official Reports 2
California Official Reports 3
California Official Reports 4
California Official Reports 5
California Official Reports 6
California Official Reports 7
California Local Court Rules
California Criminal Defense Practice
Table of Cases of California Judicial Decisions
Shepard's California Citations
Shepard's Federal Citations
California Code of Regulations
Ballentine's Law Dictionary, 3rd Edition
California Family Law Litigation Guide
Federal Habeas Corpus Practice and Procedure
California Family Law Prac. & Proc., 2nd Edition
United States Code Service
Federal Court Rules
United States Constitution
Spanish/English Legal Dictionary
Supreme Court Reports, Lawyers Edition Volumes 1 to 100
Supreme Court Reports, Lawyers Edition, 2nd Series, Volumes 1 to 133
Supreme Court Reports, Lawyers Edition, 2nd Series, Volumes 134 to Present
Unites States Supreme Court: Bench Opinions
Unites States Court of Appeals – Case Update
Unites States District Court – Case Update
Supreme Court Reports – Case Update
Unites States Court of Appeals – 1st Circuit
United States District Court – 1st Circuit (1991 – Present)
United States District Court – 1st Circuit (Prior to 1991)
Unites States Court of Appeals, 2nd Circuit (1958 to Present)
Unites States Court of Appeals, 2nd Circuit (Prior to 1958)
United States District Court - 2nd Circuit (2007 to Present)
United States District Court - 2nd Circuit (2000 to 2006)
United States District Court - 2nd Circuit (1995 to 1999)
United States District Court - 2nd Circuit (1982 to 1994)
United States District Court - 2nd Circuit (1960 to 1981)
United States District Court - 2nd Circuit (Prior to 1960)
United States Court of Appeals - 3rd Circuit
United States District Court - 3rd Circuit (2005 to Present)
United States District Court - 3rd Circuit (1994 to 2004)
United States District Court - 3rd Circuit (1983 to 1993)

United States District Court - 3rd Circuit (Prior to 1983)
Unites States Court of Appeals – 4th Circuit (1995 to Present)
United States Court of Appeals – 4th Circuit (Prior to 1995)
United States District Court – 4th Circuit (1998 to Present)
United States District Court – 4th Circuit (prior to 1998)
United States Court of Appeals 5th and 11th Circuits (1990 to Present)
United States Court of Appeals 5th and 11th Circuits (1975 to 1989)
United States Court of Appeals 5th and 11th Circuits (Prior to 1975)
United States District Court – 5th Circuit (2000 to Present)
United States District Court – 5th Circuit (Prior to 2000)
United States Court of Appeals – 6th Circuit (1995 to Present)
United States Court of Appeals – 6th Circuit (Prior to 1995)
United States District Court – 6th Circuit (2000 to Present)
United States District Court – 6th Circuit (Prior to 2000)
United States Court of Appeals – 7th Circuit (1993 to Present)
United States Court of Appeals – 7th Circuit (Prior to 1993)
United States District Court – 7th Circuit (2005 to Present)
United States District Court – 7th Circuit (1994 to 2004)
United States District Court – 7th Circuit (1983 to 1993)
United States District Court – 7th Circuit (Prior to 1983)
United States Court of Appeals – 8th Circuit (1995 to Present)
United States Court of Appeals – 8th Circuit (Prior to 1995)
United States District Court – 8th Circuit (2002 to Present)
United States District Court – 8th Circuit (Prior to 2002)
United States Court of Appeals – 9th Circuit (2002 to Present)
United States Court of Appeals – 9th Circuit (1990 to 2001)
United States Court of Appeals – 9th Circuit (Prior to 1990)
United States District Court – 9th Circuit (2008 to Present)
United States District Court – 9th Circuit (1998 to 2007)
United States District Court – 9th Circuit (Prior to 1998)
United States Court of Appeals – 10th Circuit
United States District Court – 10th Circuit (2000 to Present)
United States District Court – 10th Circuit (Prior to 2000)
United States District Court – 11th Circuit (2002 to Present)
United States District Court – 11th Circuit (Prior to 2002)
United States Court of Appeals – Federal Circuit
United States Court of Appeals – D.C. Circuit
United States District Court – District of Columbia
Judicial Council of California Jury Instructions
Constitutional Rights of Prisoners
Civil Rights Actions
California Criminal Discovery
California Evidence Courtroom Manual
California Courtroom Evidence, by Cotchett

3

      Moore's Federal Practice – Criminal
      California Forms of Pleading and Practice Annotated
      Matthew Bender License Agreement
      California Juvenile Courts Practice and Procedure
      California Superior Court Local Rules

In addition to the electronic law library, inmates are also offered access to a local telephone directory, the Ventura County Rules of Court, and lists of state and local legal forms.

Any further questions or communications should be directed to Captain Eric Dowd.

Sincerely,

Eric Dowd, Captain
Detention Services Division

# Ventura County Sheriff's Office
## Detention Services
## Divisional Policy



### Article 36
### *Inmate Mail Guidelines*

Drafted: *July 13, 2009*          Reviewed: *January 16, 2013*          Revised: *January 16, 2013*

## PURPOSE

To establish guidelines for the reception, screening, and delivery of inmate mail, books, newspapers and periodicals addressed to and from inmates in jail facilities.

## POLICY

Inmates will be permitted to send and receive unlimited mail in order to maintain communication with their legal representatives, a holder of public office, the courts, and others outside of the jail facility. Inmates may also receive softbound books, newspapers and periodicals accepted for distribution by the United States Post Office. Acceptance of these items is subject to the security procedures outlined in this policy.

## BACKGROUND

Inmates shall be afforded the right to send and receive mail via the United States Postal Service, unless the correspondence would jeopardize the safety, security, order, discipline, or control of the facility. Postcards will be accepted when they are placed into the secured drop boxes located in the lobbies of the PTDF and Todd Road Jail.

## DEFINITIONS

### INMATE MAIL

Inmates are allowed to receive postcards, softbound books, newspapers, and magazines that have been delivered from a publishing company or Internet bookstore. These items must be properly addressed to the inmate.

### CONFIDENTIAL (LEGAL) MAIL

Confidential mail is legal written material from any county, state or federal court, or any member of the State Bar (or verified legal assistants), holder of public office, and the California State Corrections Standards Authority. Inmates may also confidentially correspond with the Jail Facility Manager or Jail Facility Administrator. Mail from private attorneys must be on official letterhead and in a properly identified outer envelope to be considered confidential.

### OUTGOING MAIL

Inmates are allowed to mail letters in envelopes, postcards, and greeting cards purchased through commissary.

## PROCEDURE:

### U.S. MAIL

1. All incoming postcards, books, newspapers, and periodicals must be delivered through the U.S. Postal Service, FedEx, DHL, or UPS.

2. All incoming mail must be properly addressed with the inmates name and booking number and be mailed to: P.O. Box 6929, Ventura, CA 93006. All correspondence, with the exception of postcards, must have a return address in order to be processed within the jail facilities. Incoming mail addressed incorrectly, or with no booking number, or not sent directly from the publisher (i.e.: books, newspapers, and magazines) will be returned to sender. Incoming mail, with the exception of postcards, that have no return address shall be placed in the inmate's property. Postcards with no return address will be delivered to the inmate.

3. Marriage and birth certificates will be allowed through the mail.

4. There is no limit to the amount of mail an inmate may receive. Inmates may possess up to 20 postcards at one time. If the amount of mail in an inmate's cell is excessive and poses a fire hazard, it may be placed into the inmate's property or mailed out at the inmate's expense.

5. All incoming mail is opened and checked for contraband and money, as well as for jail management and law enforcement issues. Incoming mail generally takes several days to process and deliver to inmates. Incoming mail will be delivered to the inmate providing it does not jeopardize the legitimate penological interest of the jail facilities.

6. Inmates without money in their account shall be permitted to order two postage paid envelopes, paper, pencil and eraser to permit correspondence to family members and friends. There will be no limit on the number of postage paid letters to an inmate's attorney and to the courts.

7. Inmate mail may be read when there is a security reason and with the approval of the Jail Facility Manager.

### LEGAL MAIL

1. Clearly discernable legal mail will be opened and checked for contraband or other prohibited items in the presence of the inmate. The legal mail shall then be given to the inmate without delay.

## OUTGOING MAIL

1. All outgoing mail shall have the inmate's custody return address (Inmate Name, Booking Number, Ventura County Jail, P.O. Box 6929, Ventura, CA, 93006) on the envelope /postcard. Any mail not containing this information will be returned to the housing unit for an attempt to locate the sender.
2. There is no limit on the volume of mail an inmate may send out.

3. Items that cannot be mailed by the inmate include, but are not limited to:
   - County property, including law or library books
   - Items purchased by the Inmate Welfare Fund
   - Items purchased through commissary
   - Items made by the inmate
   - Letters containing gang graffiti

4. Envelopes that are suspected of containing contraband shall be forwarded to Classification with a Jail Incident Report (JIR) documenting the reason the letter was intercepted. Classification will contact the inmate and ascertain what is inside the envelope. The Classification officer shall open the letter in the presence of the inmate to discover its contents. The Classification officer shall write a JIR documenting the circumstances of the incident along with a disciplinary report, if applicable.

## SECURITY SCREENING

1. All incoming material, except confidential (legal) mail, shall be processed through the Detention Services mail system and screened by Detention Services security personnel to ensure appropriate security measures are observed. The security screening occurs for all incoming mail as an initial inspection to search for cash, checks, money orders, and to prevent contraband and/or sensitive material from being introduced into the jail system.

2. Any publications with the appearance of writings or illustrations that are believed to contain obscenity, violence, hatred, or other jail security compromises will not be delivered to the inmate.

3. During this process the following items will be removed from all mail: Industrial staples (if removal of industrial staple will damage the article it will be returned), standard staples (unless they are used to bind publications), paper clips, metal clamps, clasps, and questionable labels.

## CURRENCY, CHECKS and MONEY ORDERS

- Personal checks, payroll checks, third party checks, bank checks, money orders and cash are not accepted for inmate accounts. They will be returned to the sender if there is a valid return address. If there is no valid return address, it will be placed in the inmate's property.

- Only government checks from local, state, or federal government entities are accepted, and only if they are in an official envelope from the issuing agency.

## REJECTION OF INMATE MAIL

All items deemed to contain contraband or determined to be unacceptable, are returned to the sender or placed into the inmate's property if there is no return address. Certain items will be destroyed if the item cannot be placed in the inmate's property (e.g. liquids, contraband, etc.). In all cases of incoming mail rejection, the sender or inmate will receive a copy of a "Contents Unacceptable" form, generated by the Detention Mail Staff identifying the article, sender, and disposition.

The following rules will govern inmate mail privileges:

- All correspondence must be clearly addressed
- All correspondence must have a return address, with the exception of incoming postcards
- No gang codes or markings will be accepted; incoming correspondence will be returned to sender, outgoing correspondence will be returned to the inmate
- No drugs or other contraband may be enclosed in the mail
- No images depicting sexual activity, or intending to depict sexual activity
- No exposed genitalia, buttocks, or female breasts.
- Writing or pictures that tend to incite violence, riot, racism or threaten the security of the facility will not be accepted
- Inmates shall not possess excessive amounts of paper products (subscription magazines and newspapers will be limited to the current issue, five library books, and 20 postcards). This does not apply to legal mail. Extra items will be sent to inmate property or be subject to voluntary destruction. Extra newspapers are subject to destruction.

Contraband includes but is not limited to:

- Polaroid pictures with backing or any pictures or envelopes over 8" x 10"
- Blank stationary, envelopes, greeting cards, postcards, or postage stamps
- Postage stamps from incoming mail, stickers or gum labels, musical or plastic cards
- Wire, spiral bindings, pens or pencils
- Magazines/newspapers/books/packages/booklets (not from publisher or directly from authorized retail distributor)
- Food items, lottery tickets, musical items, balloons, jewelry, etc.
- Personal and payroll checks or personal ID cards
- Heavy crayon, ink drawings, glitter, foil, cloth or clothing material, plastic, or leather

- String, buttons, bows, ribbons and any similar items
- Any other items determined to be inappropriate or unacceptable for safety or security reasons

*For personal photos - The showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state will <u>not</u> be allowed.*

These items will not be delivered to the inmate and will be either returned to the sender or placed in the inmate's property.

APPEAL PROCESS FOR RETURNED MAIL

1. If incoming mail is returned for one of the reasons listed above under "Rejection of Inmate Mail", both the sender and inmate will receive notification of the opportunity to appeal. The notification will be given in the form of written "Notice" to the sender or inmate.

2. The notice to the inmate will contain the name of the publication or item, the inmate's name, the date that the publication was returned, the reason for the return and the name of the person authorizing the return. It will also include instructions how the inmate may appeal the return by following the facility Grievance Procedures.

3. The inmate may appeal the return decision within five (5) business days of the receipt of the notice using a Grievance Form. The appeal must include the inmate's name, date, the name of the publication or item in question, and all the reasons the inmate disagrees with the decision. Any reason not included in the written appeal will not be considered. Further appeals will comply with the facility Grievance Procedures.

4. Notice to the "Sender" will contain the name of the publication, or item, the inmate's name, date the publication or item was returned, the reason for the return and the name of the person authorizing the return. The notice will also provide the sender the information and instructions how to appeal the return decision.

5. The Sender may appeal within (7) business days after receipt of the notice. The sender must send the appeal by Certified Mail, addressed to the PTDF Facility Manger Ventura County Sheriff's Office Pre-trial Detention Facility 800 S. Victoria Ave. Ventura, CA 93006. The appeal must include the inmate's name, a contact person's name and address at the company or sender's location, the date, and the name of the publication or item, and all reasons that the sender disagrees with the return decision. Any reasons not listed will not be considered. If the appeal does not contain all the required information the appeal will not be considered. Senders will be notified of the appeal decision

within ten (10) business days of the receipt of the appeal. However, if the publication or item is needed in order to process the appeal, such publication will be requested of the sender, and the appeal will be placed on hold pending receipt of the item by the Facility Manager. The ten (10) day period will not begin to run until the publication or item is received, if the same has been requested.

6. If the Facility Manager, handling the appeals, needs longer than ten (10) days due to the length of the publication or the number of appeals being filed, notice will be provided to the sender that an extension of time is necessary to respond.

7. If the appeal by an inmate overturns the return, the inmate may then contact the sender by mail to request that the publication or item be re-sent. If the appeal by a sender overturns a return, the sender shall include a copy of the decision to accept the item by the Facility Manager when re-sending the publication or item.

## INVESTIGATIONS

Mail is not to be read except where there is a valid security reason to justify such action and the Facility Manager approves.

Incoming original articles of inmate mail and copies of inmate mail may be viewed or released to authorized law enforcement officials and investigators pursuant to an official investigation. Those authorized persons shall articulate a specific need for the contents of the requested information to the Detention Legal Unit.

**See Detention Services Divisional Policy #28 *"Release of Inmate Mail and Property to Investigators"* for additional information and procedures.**

## REFERENCES:

California Penal Code Section 2601

Title 15, California Code of Regulations, Sections 1063, 1066, 1068

SENDER RETURN NOTICE

Publication/Item: _____

This is to inform you that on this date_____, the above referenced
publication that you sent to inmate: _____
was returned and is being returned to you for the following reason:

_____ Prohibited Images / Photos

    Page #'s

_____

_____ Prohibited Content

    Page #'s

_____

_____ Prohibited Metal Objects

_____ Hardback Book Cover

_____
Other:_____

Signed: _____

Printed Name: _____

If you disagree with this decision, you may appeal within seven (7) business days
of the receipt of this notice. Your appeal must be postmarked and sent certified
mail to: PTDF Facility Manger, _____ . Ventura County Sheriff's
Office Pre-trial Detention Facility 800 S. Victoria Ave. Ventura, CA  93006. The
appeal must include the name of the publication, the name of the inmate, a
contact person's name and address at your company and all of the reasons that
you disagree with the decision. Any reasons not included in the written appeal
will not be considered. If the appeal does not contain all of the required
information, it will not be considered. You will be notified of the decision on the
appeal within ten (10) business days of the receipt of the appeal.

## DETAINEE/ INMATE RETURN NOTICE

DETAINEE/ INMATE NAME AND NUMBER:

_____

Publication: _____

_____

_____

This is to inform you that on this date: _____, the above referenced publication was returned for the following reason:

_____ Prohibited Images / Photos

Page #'s

_____

_____ Prohibited Content

Page #'s

_____

_____ Prohibited Metal Objects

_____ Hardback Book Cover

_____

Other:_____

Signed: _____

Printed Name: _____

If you disagree with this decision, you may appeal **by following the facility Grievance Procedures** within five (5) business days of this notice you must address your appeal using a Grievance Form. The appeal must include the name of the publication and all of the reasons that you disagree with the decision. Any reasons not included in the written appeal will not be considered. If the appeal does not contain all of the required information, it will not be considered. Further appeals will comply with the facility Grievance Procedures.

# EXHIBIT 2

```
 1   Alan E. Wisotsky (SBN 68051)
     Jeffrey Held (SBN 106991)
 2   LAW OFFICES OF ALAN E. WISOTSKY
     300 Esplanade Drive, Suite 1500
 3   Oxnard, California  93036
     Tel:    (805) 278-0920
 4   Fax:    (805) 278-0289
     E-mail:  lawyers@wisotskylaw.com
 5
     Attorneys for Respondent, CHIEF DEPUTY
 6   DAVID TENNESSEN and ASSISTANT UNDER-
     SHERIFF GARY PENTIS (sued and served as
 7   Doe I) [EXEMPT FROM FILING FEE — GOV.
     CODE §6103]
 8
```

VENTURA
SUPERIOR COURT
**FILED**

MAR 0 9 2011

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy

9      SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              FOR THE COUNTY OF VENTURA

| | |
|---|---|
| 12  In re STEVEN GARCIA, REANNA ) | No. MA-004-11 |
| SANCHEZ, VICTORIA NINE, SARAH ) | |
| 13  MURPHY McCOMACK, BROOKS BECK, ) | **RESPONDENTS' INFORMAL** |
| on Habeas Corpus on behalf of ) | **RESPONSE TO PETITION FOR WRIT** |
| 14  themselves and all others ) | **OF HABEAS CORPUS; MEMORANDUM** |
| similarly situated, ) | **OF POINTS AND AUTHORITIES AND** |
| 15 ) | **DECLARATIONS IN SUPPORT** |
|          Petitioners, ) | **THEREOF** |
| 16 ) | |
| 17      v. ) | [Declarations filed independently, under seal, in |
| ) | accordance with 2/22/11 |
| 18  CHIEF DEPUTY DAVID TENNESSEN, ) | sealing order] |
| and DOES I through X, in their ) | |
| 19  official capacity as jail ) | [Federal appellate authori- |
| administrators, ) | ties attached as exhibits to |
| 20 ) | Statement of Compliance with |
|          Respondents. ) | Rule of Court 3.1113(i), |
| 21 ) | filed concurrently herewith] |
| 22 ) | Judge:  Rebecca S. Riley |
| ) | Filed:  1/26/11 |
| 23 ) | Trial:  None set |
| 24 | |

```
25

26   TO THE HONORABLE REBECCA S. RILEY, JUDGE OF THE SUPERIOR COURT, AND

27   TO PETITIONERS' COUNSEL OF RECORD, MICHAEL C. McMAHON, CHIEF DEPUTY

28   PUBLIC DEFENDER:
```

i

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . iii

I.      PROCEDURAL HISTORY   . . . . . . . . . . . . . . . 1

II.     OBJECTION TO PETITION'S RELIANCE UPON OVERRULED
        APPELLATE AUTHORITY  . . . . . . . . . . . . . . . 1

III.    OPENING SUMMARY OF ARGUMENT  . . . . . . . . . . . 2

IV.     INTRODUCTION   . . . . . . . . . . . . . . . . . . 4

V.      THE LINCHPIN OF THE WRIT PETITION IS THAT WHERE
        THE CODE OF REGULATIONS USES THE WORD "LETTER,"
        IT MUST IMPLICITLY BE REFERRING TO ENVELOPES,
        AS WELL  . . . . . . . . . . . . . . . . . . . . . 7

VI.     THE REPETITIVE CONTENTION THAT THE POLICY EITHER
        LIMITS THE VOLUME OF LENGTHY MAIL ITEMS TO ZERO
        OR LIMITS INMATE CORRESPONDENCE TO A SINGLE
        POSTCARD IS A COMPLETE MISSTATEMENT OF THE RULE  . . .  10

VII.    BOTH STATE AND FEDERAL APPELLATE AUTHORITIES
        ARE EXTREMELY DEFERENTIAL TO THE LEGITIMATE
        SECURITY NEEDS OF PRISONS AND JAILS  . . . . . . . . . 10

VIII.   THE COVELL AND GAMBUZZA DECISIONS DIRECTLY
        DISPOSE OF THE CURRENT WRIT PETITION   . . . . . . . . 22

IX.     CONCLUSION   . . . . . . . . . . . . . . . . . . . 27

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

# TABLE OF AUTHORITIES

PAGE

**STATE CASES**

*In re Johnson*
    176 Cal.App.4th 290 (2009) . . . . . . . . . . 7, 13

*In re Rothwell*
    164 Cal.App.4th 160 (2008) . . . . . . . . . 12, 13

*People v. Davis*
    36 Cal.4th 510 (2005) . . . . . . . . . . 2, 15-17

*People v. Loyd*
    27 Cal.4th 997 (2002) . . . . . . . . . 1-5, 13-15

*Scott v. Continental Insurance Co.*
    44 Cal.App.4th 24 (1996) . . . . . . . . . . . . 8

*Thompson v. Department of Corrections*
    25 Cal.4th 117 (2001) . . . . . . . . . . . 17-19

**FEDERAL CASES**

*Bell v. Wolfish*
    441 U.S. 520 (1979) . . . . . . . . . . . 10, 11

*Covell v. Arpaio*
    662 F.Supp.2d 1146 (2009) . . . . . . . . . 23-27

*Florence v. Board of Chosen Freeholders*
    621 F.3d 296 (3d Cir. 2010) . . . . . . . . 11, 12

*Gambuzza v. Parmenter*
    2010 WL 2179029 (M.D. Fla. 2010) . . . . . . . 23, 27

*Kraushaar v. Flanigan*
    45 F.3d 1040 (7th Cir. 1995) . . . . . . . . . . 6

*Mauro v. Arpaio*
    188 F.3d 1054 (9th Cir. 1999) [en banc] . . . . 19, 20, 24

*O'Lone v. Shabazz*
    482 U.S. 342 (1987) . . . . . . . . . . . . . 22

*Procunier v. Martinez*
    416 U.S. 396 (1974) . . . . . . . . . . . . 1, 21

*Thornburgh v. Abbott*
    490 U.S. 401 (1989) . . . . . . . . . . . . 20-22

iii

*Turner v. Safley*
        482 U.S. 78 (1987) . . . . . . . . .   3, 14, 15, 18, 19, 21-26

**STATE STATUTES**

California Penal Code Section 2600  . . . . . . . . 2, 14, 15, 22

**STATE RULES**

California Rules of Court, Rule 4.551 . . . . . . . . . . .   27

**FEDERAL RULES**

Federal Rules of Civil Procedure, Rule 32.1 . . . . . . . . . 3

**STATE REGULATIONS**

California Code of Regulations, Title 15, Section 1063  . .   7, 8

**OTHER AUTHORITIES**

Concise Oxford English Dictionary (11th ed. rev., 2008),
        p. 818 . . . . . . . . . . . . . . . . . . . . . . . 9

Merriam-Webster's Collegiate Dictionary (11th ed., 2009),
        p. 713 . . . . . . . . . . . . . . . . . . . . . . . 9

Merriam-Webster's Desk Dictionary (1995), p. 313 . . . . . . 9

Merriam-Webster's School Dictionary (2004), p. 546 . . . . . 9

Oxford American Dictionary and Thesaurus (2d ed., 2009),
        p. 745 . . . . . . . . . . . . . . . . . . . . . . . 9

Random House Webster's Unabridged Dictionary
        (2d ed., 2001), p. 1104 . . . . . . . . . . . . . . 9

The American Heritage Desk Dictionary (4th ed., 2003),
        p. 487 . . . . . . . . . . . . . . . . . . . . . . . 9

The New American Webster Handy College Dictionary
        (4th ed., 2006), p. 419 . . . . . . . . . . . . . . 9

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

## I.

### PROCEDURAL HISTORY

The Court issued two orders on February 22, 2011. One required respondents to serve and file an informal response to the writ petition, in accordance with Rule of Court 4.551, in the statutory time frame of 15 days. The second order authorized the filing of respondents' supporting declarations under seal and authorized the responsive brief itself to be filed under seal, with a redacted version of the responsive brief to be publicly filed. Pursuant to these orders, the Court and petitioners' counsel will be served with unredacted copies of the responsive brief and the declarations.

Respondents are submitting six declarations in support of their jail policy being challenged by this writ proceeding. The declarants are Sgt. Rob Davidson, Tracy Martinez, Captain Jerry Hernandez,                              ., Deputy Aaron Wilkinson, and defense counsel Jeffrey Held.

## II.

### OBJECTION TO PETITION'S RELIANCE UPON OVER-
### RULED APPELLATE AUTHORITY

Portions of the petition's argument are predicated upon a United States Supreme Court decision entitled *Procunier v. Martinez*, 416 U.S. 396 (1974). See, for example, page 11, lines 7 and 12. The California Supreme Court has observed that the United States Supreme Court itself has overruled the *Procunier* decision. *People v. Loyd*, 27 Cal.4th 997, 1005, n.5 (2002).

/ / /

/ . / /

1

III.

OPENING SUMMARY OF ARGUMENT

The state Supreme Court held that the Legislature's 1994 revision of Penal Code Section 2600 was intended to make state law governing inmate regulation coextensive with federal law, especially with the United States Supreme Court decision regulating examination of inmate mail. *People v. Loyd*, 27 Cal.4th 997, 1008 (2002). The 1994 amendment reflected the Legislature's desire to repeal the expansive protections afforded to California inmates by a 1982 state Supreme Court decision and to replace them with the limited protections of California and federal Supreme Court rulings from the 1960's. All of these cases arose in the context of inmate communications.

*Loyd* involved a challenge by a pretrial detainee to monitoring of inmate communications. The California Supreme Court resolved the issue by reference to a Penal Code statute addressed to state prisons, which house convicted inmates. The unspoken premise of *Loyd* was that there was no reason why the statute should not apply equally to county jails and unconvicted inmates.

The California Supreme Court returned to the same issue a few years later to expressly clarify the application of the Penal Code provision to unconvicted pretrial detainees. Notwithstanding Penal Code Section 2600's language addressed to incarceration in a state prison, it nevertheless has equal application to county jails housing unconvicted pretrial detainees. *People v. Davis*, 36 Cal.4th 510, 526-528 (2005). Federal appellate authorities, relying upon the United States Supreme Court's adoption of the furtherance of legitimate penological interests standard, provide instruction in

2

1    cases challenging county jails' regulation of unconvicted pretrial

2    detainees.

3        The landmark United States Supreme Court decision governing

4    regulation of inmates, in general, and inmate communications, in

5    particular, is *Turner v. Safley*, 482 U.S. 78 (1987) (Exhibit 1)[1].

6    It articulated a four-part balancing test.   The *Turner* test was

7    expressly endorsed by the California Supreme Court in *Loyd*.

8        Not long ago, two federal courts issued decisions finding that

9    the four-part *Turner* test authorized just such an inmate mail

10   monitoring regulation as is challenged here.[2]  The policy requires

11   that all non-legal mail be sent and received upon postcards.   The

12   postcards are of unlimited quantity and uncensored content.   Out-

13   going postcards are metered.   Incoming postcards have the postage

14   stamps removed.

15       The smuggling of contraband into jails and prisons via both

16   manila and standard envelopes has become pandemic during the last

17   few decades.   This contraband is comprised of sharp metal objects

18   which are readily fashioned into handcuff keys and weapons and used

19   to short out electrical outlets.   This contraband also consists of

20   currency, chiefly $100 bills, as well as methamphetamine, LSD, and

21   tar heroin.   There is no reason why the same means could not be

22   utilized to transfer plastic explosives, gunpowder and igniters,

23   such as lithium.

24   _____

25      [1] All federal appellate authorities are appended to the sepa-
     rately filed Statement of Compliance with Rule of Court 3.1113(i),
26   by stated exhibit number.

27      [2] One of these federal decisions was published, one was not.
     Under federal law, after January 1, 2007, it is permissible to cite
28   unpublished opinions.  Fed. Rules App. Proc., rule 32.1(a).

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

1    Inmates do not enjoy a justifiable expectation of privacy in
2    their custodial communications.   *Loyd, supra,* 27 Cal.4th at 1007.
3    The concept of a person purporting to enjoy privacy while under
4    "legally authorized supervision would appear to be a monumental
5    anomaly."   *Id.*

6    The petition's opening comments, invoking echos of a hallowed
7    civil rights icon, Martin Luther King, Jr., are pure sophistry.
8    Credit where credit is due.   The petition's author is a clever
9    rhetorician and a fine debater.   But the smokescreen is form
10   without substance.

11   Dr. King's message could likewise have been fully conveyed
12   upon innumerable unstamped postcards.   As it was, Dr. King lacked
13   writing paper.   He scribbled the message in the margins of a news-
14   paper, wrapped around garden club news.

15                                  **IV.**

16                            **INTRODUCTION**

17   In October of 2010, the Ventura County Sheriff's Department
18   adopted a policy concerning unprivileged inmate mail.   The six-page
19   policy is authenticated by and attached to the declaration of
20   Sgt. Rob Davidson.

21   The term "privileged" is synonymously referred to both in the
22   policy and in the appellate authorities as "legal mail."   It is
23   sometimes also called "confidential mail."   The jail policy and the
24   appellate authorities define legal mail as written material from or
25   to any state or federal court, an attorney, a holder of any public
26   office, the California State Corrections Standards Authority
27   (formerly known as the Board of Corrections), and the jail facility
28   manager or administrator.   Legal mail is entitled to special

                                    4

1  protection because it implicates the attorney-client privilege, the

2  prosecution itself, and conditions of confinement.  Legal mail is

3  permissibly sent in sealed envelopes, is unlimited in quantity, and

4  may not be opened by jail officials except in the presence of the

5  inmate addressee.

6      Before the implementation of the new policy at issue in this

7  writ proceeding, non-privileged mail was treated the same as privi-

8  leged mail.  Now, under the new policy, all unprivileged corre-

9  spondence must be transmitted on postcards.  Under the policy,

10  "inmates are permitted to send and receive an unlimited number of

11  postcards."  The size of the postcards is specified as being

12  between 4" x 6" and 6" x 11".

13      Indigent inmates can process unlimited quantities of legal

14  mail through the Inmate Services and Legal Unit.  They are

15  authorized to request envelopes for their legal mail through Inmate

16  Services.  Indigent inmates are authorized to receive two postcards

17  per week from the jail commissary.

18      The new policy has nothing whatsoever to do with content.

19  This is significant because both the California and United States

20  Supreme Courts bar censorship of inmate correspondence, not moni-

21  toring of it; freedom from censorship is not equivalent to freedom

22  from inspection or perusal.  Monitoring of inmate correspondence is

23  expressly authorized.  *People v. Loyd, supra,* 27 Cal.4th at 1005,

24  n.6.

25      The new policy was adopted because experience has taught the

26  Sheriff's Department that inmates were routinely using envelopes to

27  smuggle contraband into the facility.  The declarations go into

28  more detail about the methods and nature of this smuggling.  The

1    contraband which has been interdicted has included drugs, currency,
2    and metal objects.  Metal objects can be fashioned into handcuff
3    and shackle keys and can be made into weapons.  Metal objects can
4    also be used to short-circuit electrical systems by being inserted
5    into wall jacks.  Potentially, items as dangerous as plastic
6    explosives, gunpowder, and igniting substances, such as lithium,
7    would also be concealable within the heavy-gauge paper flaps of
8    manila envelopes.

9        The envelopes facilitate smuggling of physical contraband into
10   the jail facility in several ways.  Manila envelopes are especially
11   prone to having the heavy flaps opened and resealed.  Standard
12   envelopes also facilitate smuggling of contraband, such as by
13   liquefying and spraying certain drugs on one or more sheets of
14   paper.  These can be easily placed within a standard envelope; the
15   smuggler and the recipient know that minimal, if any, handling of
16   the paper  will efface the sprayed substance.

17       Postage stamps have historically been utilized to transmit
18   drugs into jails.  One court observed that it is possible to
19   conceal "several hits of LSD on postage stamps."  *Kraushaar v.*
20   *Flanigan*, 45 F.3d 1040, 1046 (7th Cir. 1995) (Exhibit 2).  The jail
21   policy at issue forbids the use of postage stamps.  Outgoing inmate
22   mail is metered, and postage stamps are manually removed from
23   incoming mail.

24       The perception that the contents of a sealed envelope are less
25   likely to be opened, encourages the writing of dangerous communi-
26   cations.  Attacks on other inmates can be ordered, and the location
27   and quantity of controlled substances sprayed on standard-sized
28   sheets of paper can be conveyed in code.

6

1                                    V.

2      **THE LINCHPIN OF THE WRIT PETITION IS THAT**

3      **WHERE THE CODE OF REGULATIONS USES THE WORD**

4      **"LETTER," IT MUST IMPLICITLY BE REFERRING TO**

5      **ENVELOPES, AS WELL**

6           The Code of Regulations does not confer a private right of

7      action upon inmates, who lack standing to enforce its provisions.

8      Its violation is administratively enforceable by the state agency

9      responsible for jail oversight.   *In re Johnson,* 176 Cal.App.4th

10     290, 297 (2009).   Even if the provision of the Code of Regulations

11     cited by petitioners (1063(e)) meant what they say it means, its

12     enforcement would rest with an agency of state government, not

13     individuals.

14          Claim 1 of the petition contends that the jail policy violates

15     state law, which, the claim contends, allows inmates to send and

16     receive "letter mail."   The petition uses the phrase "letter mail"

17     on multiple occasions, including page 7, lines 18 and 27, and page

18     8, lines 1, 16, 25, and 26.   While the petition does not define the

19     phrase "letter mail," the implication is that a letter, by some

20     unstated definition, carries the concomitant meaning of enclosure

21     within an envelope.   For example, page 7, line 27, and page 8, line

22     1, state, "Letter mail provides confidentiality because the content

23     of the communication is enclosed in an envelope."   Claim 1

24     italicizes the word "letters" in the Code of Regulations, Title 15,

25     Section 1063, subdivision (e).   That subdivision authorizes

26     indigent inmates to be permitted at least two postage-paid letters

27     each week.   By italicizing the word "letters" in that subdivision,

28     / / /

7

1    it appears that petitioners are contending that the Code of

2    Regulations must implicitly mean to include envelopes, as well.

3         If the Code of Regulations had meant to use the word

4    "envelopes," it certainly could have done so.   The fact that

5    Section 1063, which addresses inmate correspondence, not once uses

6    the word "envelope" is a telling indication that use of envelopes

7    was not intended or mandated.

8         The standard dictionary definition of "letter" in the sense of

9    correspondence does not include the concept of being contained

10   within an envelope.   Courts frequently turn to standard dictionary

11   definitions of words which are not defined by statute, appellate

12   authority, or in the agreements between parties.   In seeking to

13   ascertain the ordinary sense of otherwise undefined words, courts

14   regularly turn to general dictionaries.   *Scott v. Continental*

15   *Insurance Co.*, 44 Cal.App.4th 24, 30 (1996).   The *Scott* court

16   stated, "Likewise, courts in noninsurance contexts turn to general

17   dictionaries when they seek to ascertain the 'ordinary' meaning of

18   words used in a statute."   *Id.*   The *Scott* court concluded, "It is

19   thus safe to say that the 'ordinary' sense of a word is to be found

20   in its dictionary definition."   *Id.*

21        The declaration of respondents' counsel, filed in support of

22   this responsive brief, attests to numerous dictionary definitions

23   which define the word "letter" in the sense of correspondence, with

24   absolutely no reference at all to a container or envelope.   The

25   following series of dictionary references demonstrates this usage:

26   / / /

27   / / /

28   / / /

8

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

1
>A written or printed communication addressed
>to a person or organization and usually trans-
2
>mitted by mail.

3 Random House Webster's Unabridged Dictionary (2d ed., 2001), p. 1104.

4
>A written or printed message addressed to a
5
>person or organization.

6 Merriam-Webster's School Dictionary (no ed. given, 2004), p. 546.

7
>A written, typed or printed communication,
>sent by post or messenger.
8
Concise Oxford English Dictionary (11th ed. rev., 2008), p. 818.

9
>A written, typed, or printed communication
10
>sent by mail or messenger.

11 Oxford American Dictionary and Thesaurus (2d ed., 2009), p. 745.

12
>A written or printed communication.

13 Merriam-Webster's Desk Dictionary (no ed. given, 1995), p. 313.

14
>A direct or personal written or printed
>message addressed to a person or organization.
15
Merriam-Webster's Collegiate Dictionary (11th ed., 2009), p. 713.

16
>A written or printed communication.
17
The American Heritage Desk Dictionary (4th ed., 2003), p. 487.

18
>A written communication.
19
The New American Webster Handy College Dictionary (4th ed., 2006),
20 p. 419.

21     The petition has not cited, and research has not disclosed,

22 any statutory or appellate definition of the word "letter" which

23 includes a requirement that it be contained in an envelope.

24     Philologically, the word "letter," referring to correspon-

25 dence, is derived from the 26 alphabetic components of language and

26 has nothing to do with envelopes.  The thrust of the petition, that

27 a communication must be enclosed in an envelope to be a letter, is

28 contradicted by the above.

9

## VI.

### THE REPETITIVE CONTENTION THAT THE POLICY EITHER LIMITS THE VOLUME OF LENGTHY MAIL ITEMS TO ZERO OR LIMITS INMATE CORRESPONDENCE TO A SINGLE POSTCARD IS A COMPLETE MISSTATEMENT OF THE RULE

Throughout the petition, it is stated that the policy somehow limits the volume of lengthy mail items to zero or to a single postcard. This misrepresentation occurs on page 8, lines 3 and 5; page 9, line 6; and page 12, lines 17 and 26. But that is not what the policy provides, at all.

The first sentence of the policy states that inmates are permitted to send and receive "an unlimited number of postcards in order to maintain communications with others outside of the jail facility." Further, inmates may also receive softbound books, newspapers, magazines, and legal mail, without limitation as to amount. The policy simply prohibits non-legal mail from being sent in stamped containers, such as manila and standard envelopes.

## VII.

### BOTH STATE AND FEDERAL APPELLATE AUTHORITIES ARE EXTREMELY DEFERENTIAL TO THE LEGITIMATE SECURITY NEEDS OF PRISONS AND JAILS

The United States Supreme Court has stated:

> A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record . . . and in other cases.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (Exhibit 3).

10

1　　　The pretrial detention facility officials in *Bell* concluded

2　that permitting the introduction of containers, such as packages of

3　personal property and food, would increase the risks of gambling,

4　theft, and inmate fights. They were not wrong in that view. It is

5　"all too obvious that such packages are handy devices for the

6　smuggling of contraband." 441 U.S. at 555. There was no basis to

7　conclude that the jail officials in *Bell* exaggerated their response

8　to serious problems or that the restriction was irrational. The

9　rule therefore did not deprive either pretrial detainees or

10　convicted inmates of the pretrial detention facility of their

11　property without due process of law in contravention of the Fifth

12　Amendment. *Id.*

13　　　What the United States Supreme Court said in *Bell* was recently

14　reiterated in *Florence v. Board of Chosen Freeholders*, 621 F.3d

15　296, 301-302 (3d Cir. 2010) (Exhibit 4):

16　　　　　　Detention in a correctional facility
carries with it the circumscription or loss of
17　　　　many significant rights. *Hudson v. Palmer*,
468 U.S. 517, 524 . . . (1984). The curtailment
18　　　　of certain rights is necessary, as a practical
matter, to accommodate a myriad of institutional
19　　　　needs and objectives of prison facilities, chief
among which is internal security. . . . Because
20　　　　privacy is greatly curtailed by the nature of
the prison environment, a detainee's Fourth
21　　　　Amendment rights are likewise diminished. *See
id.* at 526 . . . (holding that "the Fourth
22　　　　Amendment proscription against unreasonable
searches does not apply within the confines of
23　　　　the prison cell"); *Bell*, 441 U.S. at 537 . . . .
("Loss of freedom of choice and privacy are
24　　　　inherent incidents of confinement in such a
facility.").

25

26　　　　　　[T]he Supreme Court . . . has also empha-
sized that the judiciary has a very limited role
27　　　　in the administration of detention facilities,
*Block v. Rutherford*, 468 U.S. 576, 584, . . .
28　　　　(1984). Indeed, detention facilities have been
described as unique places fraught with serious

11

security dangers, [citation], the management of which courts are ill equipped to deal with [citation]. Therefore, authorities are entitled to considerable latitude in designing and implementing prison management policies. *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 . . . (1989). As the Supreme Court cautioned in *Bell*: "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." [Citation] In addition to prison administrators' professional expertise, separation of powers and federalism concerns support "wide-ranging deference to the decisions of prison authorities. [Citation] Judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive branches of our Government, not the Judicial; *Turner v. Safley*, 482 U.S. 78, 84-85, . . . (1987) ("[S]eparation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.").

621 F.3d at 301-302.

The California Court of Appeal has observed that it is significant that incarceration officials work in a unique environment where they must accomplish the basic and unavoidable task of providing reasonable personal safety for staff and inmates. *In re Rothwell*, 164 Cal.App.4th 160, 167 (2008). Unlike any other administrative context, a prison is a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. *Id.* Many of these inmates are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. *Id.* Guards and inmates coexist in direct and intimate contact.

12

1   *Id.*  Tension between them is unremitting, and relationships among

2   inmates are varied, complex, and perhaps subject to the unwritten

3   code which exhorts inmates not to inform on fellow prisoners.  *Id.*

4   The prison environment thus leaves little room for the second-

5   guessing of individual actions by the courts and "the subsequent

6   undermining of the prison officials' authority."  *Id.*

7        Whether a challenge to incarceration practices is framed as a

8   state claim or a federal constitutional claim, the same degree of

9   deference is required.  *Id.*  In another California appellate deci-

10  sion the following year, it was stated that although prisoners do

11  not lose all rights at the prison gate, "lawful incarceration

12  brings about the necessary withdrawal or limitation of many privi-

13  leges and rights, a retraction justified by the considerations

14  underlying our penal system."  *In re Johnson*, 176 Cal.App.4th 290,

15  296 (2009), citing two United States Supreme Court decisions.  The

16  law does not protect against every change in the conditions of

17  confinement having an adverse impact on an inmate.  *Id.* at 297.

18  Incarceration regulations are designed to guide officials in the

19  administration of the facilities, rather than being designed to

20  confer rights upon inmates.  *Id.*  To this end, courts must grant

21  "great deference to a prison's decision to impose discipline

22  against an inmate."  *Id.* at 297.

23       The California Supreme Court has supported the retracted

24  rights of inmates on three occasions in this century alone.  In

25  *People v. Loyd, supra,* 27 Cal.4th 997, the criminal defendant was

26  convicted of two counts of first-degree murder plus one count of

27  arson.  The appeal was based upon the effect "of only California

28  law."  Before the criminal trial began, the defendant sought a

1  ruling on the legality of the taping of her personal visits and
2  telephone calls.  The defendant formally moved for the dismissal of
3  the charges or recusal of the prosecutor.

4      The *Loyd* court approved the validity of the practice of
5  monitoring inmates' conversations with visitors, as having been
6  restored by an amendment to the Penal Code defining the extent to
7  which inmates may be deprived of their constitutional rights.  The
8  state Supreme Court had previously banned such monitoring in a 1982
9  decision.   In reversing that decision, the *Loyd* court based its
10 ruling on the 1994 legislative redrafting of a Penal Code statute,
11 Section 2600, to read, "A person sentenced to imprisonment in a
12 state prison may . . . be deprived of such rights, and only such
13 rights,  as  is  reasonably  related  to  legitimate  penological
14 interests."  27 Cal.4th at 304.   The crucial importance to this
15 litigation of that statute is that the state Legislature adopted
16 the language of the United States Supreme Court in *Turner v.*
17 *Safley*, *supra*, 482 U.S. 78.   Therefore, it is indisputable that
18 federal  and  state  law  are  inextricably  intertwined,  as  the
19 Legislature,  in  Section  2600  of  the  Penal  Code,  adopted  the
20 standard  articulated  by  the  United  States  Supreme  Court  for
21 defining inmates' rights.  *Loyd*, 27 Cal.4th at 1008.

22      A  right  of  confidentiality  exists  only  for  protected
23 communications, like those between an inmate and counsel.  *Loyd*,
24 27 Cal.4th at 1000.  In overruling its contrary decision 20 years
25 earlier, the state Supreme Court adopted the analysis of the
26 dissenters in that case.  The practice of monitoring an inmate's
27 communications is reasonably necessary to maintain jail security.
28 A person incarcerated in a jail or prison possesses no justifiable

14

1  expectation of privacy. *Id.* at 1001. A person detained in a jail
2  cannot reasonably expect to enjoy the privacy afforded to a person
3  in free society. *Id.* His lack of privacy is a necessary adjunct
4  to his imprisonment. *Id.*

5      To say that a public jail is the equivalent of a person's
6  home, or that it is a place where he can claim constitutional
7  immunity from search or seizure of his person, papers, or effects,
8  is a surprising and incorrect argument. 27 Cal.4th at 1002. It is
9  readily apparent that a jail shares none of the attributes of
10  privacy of a home, automobile, office, or hotel room. In custodial
11  environments, official surveillance is the order of the day.

12      The rights of prisoners do not enjoy "stringent protection."
13  27 Cal.4th at 1008. The *Loyd* court held that the holding of the
14  United States Supreme Court in *Turner v. Safley* now controls the
15  field with regard to monitoring inmate communications (while *Loyd*
16  involved a verbal intercept, *Turner* itself involved intercepting
17  inmate mail). *Id.*

18      The 1994 amendment of Penal Code Section 2600 reflected the
19  Legislature's desire to repeal the expansive protections afforded
20  to California inmates and replace them with the more limited
21  protections available under federal law, as described in *Turner v.*
22  *Safley*. *Loyd*, 27 Cal.4th at 1008. The *Loyd* court stated, "We hold
23  the monitoring of inmates' conversations with visitors to be
24  another such regulation that has become valid after the 1994
25  amendment." *Id.*

26      In *People v. Davis*, 36 Cal.4th 510 (2005), the court stated
27  that the United States Supreme Court held, in 1984, that convicted
28  prisoners have no legitimate expectation of privacy in their cells

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

1   and, thus, no Fourth Amendment protection from cell searches.   The

2   defendant in *Davis* argued that persons who are in custody but have

3   not yet been convicted have privacy interests which the Fourth

4   Amendment protects from intrusion, absent an articulable legitimate

5   institutional security interest.   36 Cal.4th at 525.   Rejecting

6   that argument, the state Supreme Court wrote, "We are not

7   persuaded."   *Id.* at 526.

8        The California Supreme Court sided with those appellate deci-

9   sions holding that there is no principled basis to apply a dif-

10  ferent rule to unconvicted prisoners, such as pretrial detainees.

11  The state Supreme Court wrote, "We agree with this latter line of

12  cases that persons held pretrial in a jail . . . have no expec-

13  tation of privacy for the following reasons."   36 Cal.4th at 527.

14  Jail security requires close and continued surveillance of inmates

15  and their cells.   *Id.*.   Therefore, the Supreme Court's holding in

16  its 1984 decision, that prisoners have no legitimate expectation of

17  privacy in their cells and thus no Fourth Amendment protection from

18  housing searches, applies with equal force to unconvicted inmates

19  and their housing locations.   Jail security always requires close

20  and continuous surveillance of all inmates and their cells.

21  36 Cal.4th at 527.   Pretrial detainees pose similar, if not the

22  same, security concerns as convicted prisoners.   *Id.*   There is no

23  basis for concluding that pretrial detainees pose any lesser

24  security risk than convicted inmates.   *Id.*

25        It is the very fact of arrest and incarceration which abates

26  all Fourth Amendment privacy and possessory interests both in

27  personal effects and in housing areas.   36 Cal.4th at 527.   It is

28  reasonable for jail officials to search and seize the contents of

1   an inmate's cell.  The rule applies, held the state Supreme Court,

2   to all searches involving jails, regardless of the purpose of the

3   search.  Even if the inmate claims that the search or seizure

4   violated the Constitution because it was designed solely to harass,

5   that does not change the rule at all.  *Id.*

6        The *Davis* court also explained that although the 1984 United

7   States Supreme Court decision involved the physical search of his

8   cell, the rationale extended to all jail monitoring.  The rationale

9   extends, for example, to eavesdropping.  36 Cal.4th at 527.  All

10   jail monitoring is really the same, whether it involves cell

11   searches, eavesdropping, or other security contexts.  *Id.*  The

12   point is that pretrial detainees have no legitimate expectation

13   that their jailhouse communications will not be monitored or

14   recorded.  *Id.* at 528.  The purpose of the search is irrelevant.

15   *Id.*  Pretrial detainees cannot reasonably "expect any privacy."

16   *Id.*  It is the fact that an official intrusion may occur, not the

17   reason for the intrusion, which vitiates the expectation of

18   privacy.  *Id.*

19        The third state Supreme Court case concerning the issue of

20   inmate monitoring, decided this century, is *Thompson v. Department*

21   *of Corrections*, 25 Cal.4th 117 (2001).  In that case, the Supreme

22   Court held that an internal prison regulation which required a

23   condemned inmate's spiritual advisor of choice to leave the inmate

24   20 minutes before he was taken to the execution chamber was

25   reasonably related to legitimate penological interests.  The rule

26   therefore violated neither the state statute governing rights

27   surrendered by inmates nor the inmate's First Amendment religious

28   freedoms.  It was a legitimate security precaution, and it did not

1    deny the inmates the opportunity to practice their religion.
2    25 Cal.4th at 132.   The California Supreme Court returned to the
3    origin for its decision:   "To determine whether defendants here
4    violated section 2600 by not permitting Reverend Harrell to stay
5    with Thompson until he was taken to the execution chamber, we apply
6    the high court's test in *Turner, supra,* 482 U.S. 78 . . . ."

7        The state Supreme Court in *Thompson* evaluated the challenge to
8    the regulation under the four-factor test of the U.S. Supreme Court
9    decision in *Turner v. Safley*.   The first factor is whether there is
10   a valid connection between the regulation and the government
11   interest put forward to justify it.   The second *Turner* factor is
12   whether the prisoner has alternative means of exercising the
13   constitutional right in question.   The *Thompson* court held that
14   that factor weighed in favor of the regulation because the custody
15   facility did not deny inmates the opportunity to practice their
16   religion; it only enforced restrictions on the time, place, and
17   manner of that exercise.

18       The third *Turner* factor is the effect which accommodation of
19   the asserted constitutional right would have upon staff, other
20   inmates, and the allocation of prison resources.[3]   If the right
21   requested would have an equal or greater negative impact upon the
22   personal safety of those who live and work in the jail, it will not
23   be recognized.

24       The last *Turner* factor is the availability of ready
25   alternatives to the regulation at stake.   If there is no cogent
26

27   _____

     [3] The fact that the Sheriff's Department saves considerable
28   resources by not having to open thousands of envelopes annually
     helps tip factor three in the challenged regulation's favor.

                                    18

1  suggestion of equally viable alternatives which would eliminate the

2  security concerns, then the jail policy is tenable and not viola-

3  tive of any rights.   25 Cal.4th at 133.

4      It is instructive, then, considering the state Supreme Court's

5  oft-repeated instruction that the state Legislature's adoption of

6  the four-factor test in *Turner v. Safley* controls adjudication of

7  inmate challenges to all incarceration regulations, to see how

8  federal appellate precedent applies the four-factor test of *Turner*

9  *v. Safley* to inmate communication issues.   A most telling analysis

10 occurs in the en banc Ninth Circuit decision in *Mauro v. Arpaio*,

11 188 F.3d 1054 (9th Cir. 1999) [en banc] [Exhibit 5].

12     *Mauro* is particularly persuasive for a number of reasons.   It

13 is an en banc decision, so it represents the judgment not just of

14 a single panel of three circuit judges, but the entire circuit.

15 The decision involves a pretrial detention facility, as does the

16 current case.   There was no documented history of trouble

17 occasioned by the regulated mail.   The communication sought to be

18 prohibited by the county jail regulation in *Mauro* was extremely

19 benign; it was not a weapon, an escape device, an illegal drug, nor

20 any kind of exhortation to hatred, violence, or prejudice.

21     The prohibited communication in *Mauro* was a Playboy magazine.

22 The Ninth Circuit analyzed and applied the four *Turner v. Safley*

23 factors to hold that the jail's policy of excluding all material

24 containing pornography was reasonably related to legitimate peno-

25 logical interests.   The regulation was based upon pure speculation

26 that such publications might create stimulus of primal urges, but

27 there was no actual example where that had occurred.   The jail

28 officials in *Mauro* had no evidence that the banned material had

19

1  actually ever caused any problems in the past nor any studies to
2  predict future problems with such materials.  188 F.3d at 1060.

3      Contrast the wealth of evidence adduced by the declarants in
4  the present case.  It is apparent that if a fully benign communi-
5  cation can be excluded because it *might* create a problem, mail
6  containers which have demonstrably created past security risks are
7  certainly viable.

8      The *Mauro* court explained that the fact that the jail policy
9  might exclude artistic or scientific journals did not render the
10 policy unconstitutional or overbroad.  *Id.*  A challenged jail regu-
11 lation is not required to pass a least restrictive alternative test
12 to withstand constitutional challenge.  188 F.3d at 1060, n.4.

13     The jail, in *Mauro*, candidly admitted that the fit between the
14 policy and the jail's past experience was not exact, but an exact
15 fit is not required.  188 F.3d at 1060.  Some inmates had previ-
16 ously used photos to illustrate nude anatomical comparisons with
17 the female loved ones of other inmates, which led to fights.  But
18 those photographs were of known persons, unlike the models in the
19 Playboy magazine.

20     One of the leading United States Supreme Court decisions
21 applying the legitimate penological interests test to jail mail is
22 *Thornburgh v. Abbott*, 490 U.S. 401 (1989) (Exhibit 6).  In that
23 case, a class of inmates filed suit, claiming that Federal Bureau
24 of Prisons regulations, which applied to exclude 46 publications,
25 violated their First Amendment rights.

26     Noting that "the kind of censorship just described would raise
27 grave First Amendment concerns outside the prison context,"
28 490 U.S. at 407, it was an entirely different story behind prison

20

1  walls.  Any rights which prisoners possess "must be exercised with
2  due regard for the inordinately difficult undertaking that is
3  modern prison administration." *Id.*, citing *Turner v. Safley*.  The
4  Supreme Court is sensitive to the delicate balance which prison
5  administrators must strike between the order and security of the
6  internal prison environment and trying to accommodate the legiti-
7  mate demands of those who seek to enter the secure environment
8  through the written word.  *Id.*  While access to lawyers and legal
9  assistants representing prisoner clients is certainly almost
10  sacrosanct, *id.*, no such protection exists for others.

11  Prison officials may well conclude that certain proposed
12  interactions, "though seemingly innocuous to laymen, have poten-
13  tially significant implications for the order and security of the
14  prison." *Id.*  Acknowledging the expertise of custody officials and
15  that "the judiciary is ill equipped to deal with the difficult and
16  delicate problems of prison management," the Supreme Court affords
17  considerable deference to the determinations of custody admin-
18  istrators who, "in the interest of security, regulate the relations
19  between prisoners and the outside world."  490 U.S. at 408.

20  The reason the *Thornburgh* court overruled the *Procunier*
21  decision, relied on by the writ petitioners in the instant case at
22  page 11, under Claim 3, is that it could be read, and had been
23  read, to require a strict least restrictive alternative analysis
24  "without sufficient sensitivity to the need for discretion in
25  meeting legitimate prison needs."  490 U.S. at 410.  If the rule
26  were as the *Procunier* decision held, every administrative judgment
27  would be subject to the possibility that some court somewhere could
28  conclude that it had a less restrictive way of solving the problem

21

1  at hand. *Id.* at 410-411.  The cost of a least restrictive alterna-

2  tive rule is too high.  *Id.* at 411.   The *Thornburgh* court noted

3  that the same analysis applied to religious challenges, citing its

4  decision in *O'Lone v. Shabazz*, 482 U.S. 342 (1987) (Exhibit 7).

5       The *Thornburgh* court rejected any approach which would attempt

6  to forge some separate standard for cases implicating the rights of

7  outsiders versus prisoners — that would be out of step with many

8  United States Supreme Court decisions.   490 U.S. at 411.  No

9  approach which fails to afford jail officials sufficient discretion

10  to protect prison security is acceptable.  *Id.* at 413.

11       The *Thornburgh* court then analyzed the four *Turner* factors.

12  The first factor, for example, is whether the governmental regula-

13  tion is neutral and whether the regulation at issue is rationally

14  related to that objective.   The policy being challenged in the

15  current litigation applies to all inmate correspondence and is

16  designed to interdict contraband weapons, drugs, currency, and

17  explosives.  It therefore passes the test, with flying colors.

18  Broad discretion is accorded to jail officials regulating inmate

19  correspondence, because this effect is rationally related to

20  legitimate security interests.  490 U.S. at 416.

21                              VIII.

22        <u>THE *COVELL* AND *GAMBUZZA* DECISIONS DIRECTLY</u>

23          <u>DISPOSE OF THE CURRENT WRIT PETITION</u>

24       Having now established that the California Supreme Court has

25  held that the state Legislature, in enacting Penal Code Section

26  2600, intended to adopt the four-factor test of *Turner v. Safley*,

27  27 Cal.4th at 1008, for all incarceration contexts, it remains to

28  be seen if any appellate decision has applied the four-part *Turner*

1  *v. Safley* analysis to a postcard-only policy.   Research has

2  disclosed two such cases, each of which fully endorsed such a

3  policy.   Those decisions are *Covell v. Arpaio*, 662 F.Supp.2d 1146

4  (2009) (Exhibit 8), and *Gambuzza v. Parmenter*, 2010 WL 2179029

5  (M.D. Fla. 2010) (Exhibit 9).

6       The plaintiff, in *Covell*, brought a civil lawsuit in federal

7  court, claiming that the defendant jail officials violated First

8  Amendment rights by instituting a policy which banned incoming

9  envelopes by restricting inmates' non-legal incoming mail strictly

10  to metered postcards.   The jail argued that the mail policy

11  limiting incoming non-privileged mail to metered postcards passed

12  muster under the four-prong test set out in *Turner v. Safley*.

13  *Covell*, 662 F.Supp.2d at 1149.   The *Covell* court aptly noted the

14  postcard policy's satisfaction of the *Turner* elements.

15       The defendant jail in *Covell* contended that its policy had a

16  rational connection to a legitimate governmental interest, namely,

17  to prevent smuggling of contraband and to promote safety and

18  security.   662 F.Supp.2d at 1149.   Defendant claimed that metered

19  mail was required because a variety of drugs, including tar heroin,

20  phencyclidine, LSD, marijuana, cocaine, and powdered pills, were

21  concealed under postage stamps.   Defendant further claimed that

22  note pads had been hollowed to create hidden depositories for other

23  contraband, including razor blades, handcuff keys, and other

24  weapons.

25       The jail asserted that plaintiff had alternative means of

26  communication.   He could send and receive an unlimited number of

27  postcards, he could receive visitors, and he could communicate by

28  phone.

RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

1    Defendant asserted that there would be an adverse impact upon

2    jail staff, other inmates, and prison resources if the jail were to

3    accommodate inmate mail correspondence other than by metered

4    postcards for non-legal mail.  The jail finally argued that there

5    would be an increase in the likelihood of contraband smuggling,

6    which in turn would place inmates and staff at risk.  The defendant

7    jail claimed that there were no obvious, easy alternatives to the

8    mail policy it adopted.  662 F.Supp.2d at 1149.

9        In its analysis, the court noted that inmates' First Amendment

10   rights are necessarily curtailed by the fact of incarceration.

11   662 F.Supp.2d at 1152.  A regulation would be lawful even if it

12   impinged upon First Amendment rights, as long as it was reasonably

13   related to legitimate penological interests.   *Id.*   Deterring

14   criminal activity and maintaining security are legitimate peno-

15   logical interests which justify regulation of prisoner mail.  *Id.*

16       Articulating the four *Turner* factors at 662 F.Supp.2d 1152,

17   the *Covell* court noted that "the standard is deferential. Courts

18   must give "substantial deference to the professional judgment of

19   prison administrators."

20       A court does not have to agree with the officials' proffered

21   legitimate penological interest.  *Id.*  The inquiry under *Turner* is

22   not whether the policy actually serves a penological interest but,

23   rather, whether it would be rational for jail officials to believe

24   that it would.  *Id.* at 1152-1153, citing *Mauro v. Arpaio*, 188 F.3d

25   at 1060.

26       The *Covell* court noted that the first factor requires a

27   determination of whether the governmental objective underlying the

28   policy is legitimate, neutral, and rationally related to the

24

1  objective.   The purpose of the mail policy was to eliminate or

2  limit the mail smuggling of contraband into the jail from non-

3  inmates to inmates.   The back of postage stamps had contained

4  various drugs, body fluids, and other unknown liquids and powders.

5  Bindings were hollowed to conceal contraband such as metal strips

6  or pieces, handcuff keys, and even saw blades.   But the policy did

7  not limit the substance or content of communications between

8  inmates and others.

9      While the plaintiff in *Covell* disputed the extent, rather than

10  the existence, of contraband smuggling, he did not have personal

11  knowledge about the prevalence of contraband in the jail, so his

12  calculations were based merely on speculation.   A general claim

13  that a metered postcard mail policy for non-legal mail was not

14  rationally related to a legitimate penological objective was

15  nothing more than a conclusory allegation insufficient under the

16  law.

17      Prison regulations may be based upon common-sense connections

18  between a problem and a solution.   662 F.Supp.2d at 1154.   The

19  second factor under *Turner* considers whether there are alternative

20  means of exercising the right which remain open to the prison

21  inmates.   The right at issue, in this situation, is the right to

22  communicate with family and friends.   Inmates have a First Amend-

23  ment right to receive mail; metered postcards, telephone calls, and

24  jail visits may be less than ideal means of communicating with

25  family and friends, but the jail-provided alternatives need not be

26  ideal."   *Id.*   Therefore, the second *Turner* factor weighed in favor

27  of the jail policy.

28  / / /

1    The third factor was the adverse impact of accommodation.   A
2  different policy allowing stamps on envelopes would increase the
3  likelihood of smuggling contraband into the jail, which in turn
4  would lead to conflicts and violence between inmates.  *Id*.  The
5  declarant in *Covell* attested that eliminating stamped mail allowed
6  limited security staff to devote more time to prison security
7  assignments.  *Id*.  When accommodation of an asserted right will
8  have a significant ripple effect on other inmates or on prison
9  staff, courts should be "particularly deferential to the informed
10 discretion of corrections officials."  *Covell*, 662 F.Supp.2d at
11 1154, quoting *Turner v. Safley*, 482 U.S. at 90.

12    The final *Turner* factor examines whether the policy is an
13 overreaction or exaggerated response to a concern.  But the plain-
14 tiff bears the burden of showing that there are "obvious, easy
15 alternatives to the regulation."  662 F.Supp.2d at 1154.  If plain-
16 tiff can identify an alternative which fully accommodates the right
17 "at a de minimis cost to valid penological goals," the policy is an
18 exaggerated response.  *Id*. at 1155.

19    The plaintiff contended that jail staff could inspect each
20 piece of mail and remove the stamps.  But there was no evidence
21 that this alternative would accommodate the right or the de minimis
22 cost to the jail.  Nor did the plaintiff demonstrate that this
23 alternative would not cause administrative inconvenience, a factor
24 relevant to the final *Turner* prong.

25    Therefore, the court concluded that the plaintiff had not
26 established a genuine issue of material fact that the metered
27 postcard policy violated his First Amendment rights.  Contrarily,
28 the jail showed that the mail policy was reasonably related to

26

1  legitimate penological objectives. Defendant was therefore

2  entitled to summary judgment. 662 F.Supp.2d at 1155.

3    The *Gambuzza* court also approved a newly adopted county jail

4  postcard-only policy. The *Gambuzza* court stated:

5         Lawful incarceration brings about the
         necessary withdrawal or limitation of many
6        privileges and rights, a retraction justified
         by the considerations underlying our penal
7        system. [Citing federal Supreme Court
         precedent] [T]he constitutional rights that
8        prisoners possess are more limited in scope
         than the constitutional rights held by
9        individuals in society at large. ¶ . . .
         [Prisoner] rights must be weighed with due
10       regard for the inordinately difficult under-
         taking that is modern prison administration.
11       [Citing federal Supreme Court precedent]
         Prison[4] officials must weigh the need for
12       internal order and security against the rights
         of prisoners and those on the outside who seek
13       to communicate with such prisoners.

14  *Gambuzza*, star page 2.

15                              IX.

16                          CONCLUSION

17    Respondents respectfully request that this Court deny the

18  petition, providing the basis required by Rule of Court 4.551(g).

19

20    Dated: March 9, 2011

21                          LAW OFFICES OF ALAN E. WISOTSKY

22                          By: _____

23                              JEFFREY HELD
                                Attorneys for Respondents,
24                              DAVID TENNESSEN and GARY PENTIS

25

26  _____

27    [4] Federal appellate decisions utilize the term "prison"
    interchangeably with "county jail"; *Gambuzza* itself involved a
28  postcard-only policy challenged by county jail inmates.

                              27
    _____
    RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

1 | STATE OF CALIFORNIA, COUNTY OF VENTURA:

2 |     I am employed in the County of Ventura, State of California. I am over the age of 18 and not a party to the within action; my
3 | business address is 300 Esplanade Drive, Suite 1500, Oxnard, California 93036.

4 |
5 |     On March ___, 2011, I served the foregoing document described as **RESPONDENTS' INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARA-**
6 | **TIONS IN SUPPORT THEREOF** on all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope
7 | addressed as follows:

8 | Stephen P. Lipson                    Attorneys for Petitioners
  | Public Defender
9 | Michael C. McMahon
  | Chief Deputy
10 | Office of the Public Defender
  | Hall of Justice, Room 207
11 | 800 South Victoria Avenue
  | Ventura, CA  93009

12 |
13 |     I delivered such envelope by hand to the offices of the addressee.

14 |     Executed on March ___, 2011, at Oxnard, California.

15 |     I declare under penalty of perjury under the laws of the State
16 | of California that the above is true and correct.

17 |

18 | _____
  | KYLE ROBSON

19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# EXHIBIT 3

1  Alan E. Wisotsky – State Bar No. 68051
2  Jeffrey Held – State Bar No. 106991
   WISOTSKY, PROCTER & SHYER
3  300 Esplanade Drive, Suite 1500
   Oxnard, California 93036
4  Phone: (805) 278-0920
   Facsimile: (805) 278-0289
5  E-Mail: jheld@wps-law.net



VENTURA
SUPERIOR COURT
FILED
NOV 14 2011
MICHAEL D. PLANET
Executive Officer and Clerk
BY: _____ Deputy

6  Attorneys for Respondent, ASSISTANT UNDERSHERIFF
7  GARY PENTIS (sued and served as DOE 1) [EXEMPT FROM
   FILING FEE – GOV. CODE Section 6103]

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF VENTURA

10  In   re   STEVEN   GARCIA,   REANNA     CASE NO. MA-004-11
11  SANCHEZ,  VICTORIA   NINE,   SARAH
    MURPHY McCOMACK, BROOKS BECK, on    NOTICE OF COMPLIANCE WITH
12  Habeas Corpus on behalf of themselves and all   COURT'S PARTIAL UNSEALING ORDER
    others similarly situated,
13                                                 Judge: Rebecca S. Riley
              Petitioners,                         Filed: January 26, 2011
14                                                 Trial: None set
       vs.
15
    CHIEF DEPUTY DAVID TENNESSEN, and
16  DOES 1 through X, in their official capacity as
    jail administrators,
17
              Respondents.
18

19     TO:   MOVING PARTY, VENTURA COUNTY STAR BY IT'S COUNSEL OF RECORD,
20  LAURA COTA AND TO PETITIONERS AND TO THEIR COUNSEL OF RECORD, MICHAEL
21  McMAHON:
22       In accordance with Judge Riley's order of November 1, 2011, respondent now complies fully
23  with that order.  Respondent attaches hereto authentic photocopies of the formerly sealed declarations
24  filed on March 9, 2011, redacted in accordance with Judge Riley's order.  These redactions are to
25  paragraph 3 of the declaration of Jerry Hernandez; paragraph 8(a) of the declaration of Aaron
26  Wilkinson; the entirely unredacted declaration of Rob Davidson; the entirely unredacted declaration of
27  Tracy Martinez; the entirely unredacted declaration of Jeffrey Held; and, the redacted declaration of
28  an individual declarant whose identity was kept sealed by Judge Riley's November 1, 2011, order,

                                          1
          NOTICE OF COMPLIANCE WITH COURT'S PARTIAL UNSEALING ORDER

1   those redacted paragraphs being paragraphs 3, 13, 14, 15, 16, 18 and 22.

2       In further compliance with Judge Riley's order, the sealed brief filed the same date as the

3   sealed declarations is appended hereto, with the remaining single redaction being the unnamed

4   declarant's name, found on page one, line 16.

5

6       Dated:  November  10  , 2011

7                                           WISOTSKY, PROCTER & SHYER

8

9                                           By: _____

10                                              JEFFREY HELD
                                               Attorneys for Respondent

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

NOTICE OF COMPLIANCE WITH COURT'S PARTIAL UNSEALING ORDER

Re:  *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
     VCSC Case No. MA-004-11

## DECLARATION OF SGT. ROB DAVIDSON

I, Sgt. Rob Davidson, declare as follows:

1.    I make this declaration of facts based upon information which is personally known to me.  If called to testify as a witness to the information contained in this declaration, I would compe-tently and accurately do so under penalty of perjury of the laws of the State of California.

2.    I am the Legal Sergeant for the Ventura County Sheriff's Department, Detention Services Division.  I have held that position continuously and full time since July of 2008.  I have been a sworn peace officer since 1994.  In my capacity as the Legal Sergeant, I am knowledgeable concerning jail operations, jail policies and practices, as well as records concerning the jail's inmate population.

3.    On October 8, 2010, the Ventura County Sheriff's Department, Detention Services Division, adopted and implemented revised Article 36 of the Detention Services Division policy entitled "Inmate Mail Guidelines."

4.    This policy limits incoming and outgoing inmate mail to postcards, no smaller than 4" × 6" and no greater than 6" × 11".  An exception is made for privileged communication.  Privileged mail is sometimes referred to as "confidential" or "legal mail."  As a general description, privileged mail includes correspondence to and from privileged sources, such as lawyers, courts, and doctors.

/ / /

/ / /

1       5.   Attached hereto and incorporated by reference as Exhibit

2   G is an authentic photocopy of the six-page policy referenced in

3   my declaration.

4       I declare under penalty of perjury under the laws of the State

5   of California that the foregoing information is true and correct.

6   Executed this 28ᵀᴴ day of FEBRUARY, 2011, at Ventura,

7   California.

8

9   ROB DAVIDSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF SGT. ROB DAVIDSON

Re: *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
VCSC Case No. MA-004-11

### DECLARATION OF TRACY MARTINEZ

I, Tracy Martinez, declare as follows:

1.   I make this declaration of facts based upon information which is personally known to me.  If called to testify as a witness to the information contained in this declaration, I would competently and accurately do so under penalty of perjury of the laws of the State of California.

2.   I am employed by the Ventura County Sheriff's Department in the capacity of Administrative Assistant in the Detention Services Legal Unit.  I have been so employed, continuously and full time, for the last two and a half years.

3.   I have been employed by the Ventura County Sheriff's Department, continuously and full time, since 1993.  Before that, I worked for the Sheriff's Department from 1989 to 1992.

4.   Between 1989 and 1991, I was assigned to the Detention Services Division as a cadet in the mailroom.  It was my job to collect, locate, search, and sort inmate mail for all of the Ventura County Sheriff's Department's custodial facilities.

5.   In that capacity, I was trained to perform this job by previous mail clerks, as well as sworn personnel.

6.   In the performance of these duties, I discovered narcotics concealed in the incoming mail.

7.   These narcotics were concealed under postage stamps and in the seams of envelopes.

8.   The narcotics which I recognized were tar heroin.

/ / /

1

DECLARATION OF TRACY MARTINEZ

9.   In addition, I discovered suspicious, unknown substances, such as blank sheets of paper which appeared to have been saturated in some liquid so that there were water marks or spots which looked like they had been wet at one time.

10.   I disposed of all of these items.

11.   While processing inmate mail in that job assignment, in addition to narcotics, I located other items which were considered contraband.   These items could have jeopardized the safety and security of our jail staff, as well as the inmates.

12.   These items consisted of paperclips and staples.

13.   These paperclips and staples which I occasionally dis-covered while processing inmate mail, in my job assignment as a cadet, could have been fashioned into handcuff or shackle keys. Additionally, several of these small sharp metal objects could have been linked together into a long metal object which could have been utilized as a weapon.

I declare under penalty of perjury under the laws of the State of California that the foregoing information is true and correct.

Executed this __10__ day of February, 2011, at Ventura, California.


_____
TRACY MARTINEZ


2

DECLARATION OF TRACY MARTINEZ

1  Re:  *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
   VCSC Case No. MA-004-11

2

3              <u>DECLARATION OF JERRY HERNANDEZ</u>

4       I, Jerry Hernandez, declare as follows:

5       1.   I make this declaration of facts based upon information

6  which is personally known to me.  If called to testify as a witness

7  to the information contained in this declaration, I would compe-

8  tently and accurately do so under penalty of perjury of the laws of

9  the State of California.

10      2.   I am a captain employed by the Ventura County Sheriff's

11 Department.  I have held that position continuously and full time

12 since 2001.  I have been a sworn employee of the Ventura County

13 Sheriff's Department since 1985.

14      3.

15

16      4.   In 1985, I was a deputy sheriff assigned to the women's

17 facility at the Branch Jail Honor Farm in Ojai, California.  One of

18 my duties as a deputy in that position was to sort and examine mail

19 for contraband.

20      5.   It was there that I was trained to identify methods by

21 which persons sent in contraband hidden in the mail.  By "contra-

22 band," I mean either narcotics or narcotics containers.

23      6.   I examined all forms of mail, including postcards,

24 envelopes, and letters.

25      7.   During those times that I performed this duty, I found

26 drugs hidden under stamps or contained within the paper materials

27 in letters and both standard and manila envelopes.

28 / / /

                          1

8.    Less frequently, I also discovered postcards which had been modified by being split in two by a sharp object, such as a razor blade, which were then glued back together with the contraband concealed inside.

9.    I also examined Polaroids which were sent to inmates and, as a matter of practice, removed the backing of the Polaroids to search for drugs.

10.    During that time, I found black tar heroin and LSD.  I also found other, unknown substances, which I discarded.

11.    While I did not discover any sharp metal objects, such as staples or paperclips, contained in the envelopes during my time in that assignment, such objects would have fit in the same locations in the envelopes.  These sharp metal objects could have been used to fashion handcuff keys or weapons.

12.    It is imperative that jail facilities, such as the Sheriff's Department operates, be as free as possible of contraband, such as drugs and sharp metal objects which can be fashioned into handcuff and shackle keys and weapons.  The attempted smuggling of this contraband into jails has been a long-term historical problem.  Law enforcement needs to be able to examine the containers in which mail arrives at the facility in order to effectively interdict the supply of contraband into the jails which we operate in order to enhance the safety and security of the custodial staff, as well as the inmates; to prevent attempted

/ / /

/ / /

/ / /

/ / /

2

DECLARATION OF JERRY HERNANDEZ

1   escapes; and to prevent injuries, even death, from accidental

2   overdoses of drugs.

3       I declare under penalty of perjury under the laws of the State

4   of California that the foregoing information is true and correct.

5       Executed this 9th day of February, 2011, at Santa Paula,

6   California.

7

8                                    JERRY HERNANDEZ

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              3

                   DECLARATION OF JERRY HERNANDEZ

Re: *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
    VCSC Case No. MA-004-11

<u>DECLARATION OF</u>

I, _____, declare as follows:

1.   I make this declaration of facts based upon information which is personally known to me.  If called to testify as a witness to the information contained in this declaration, I would competently and accurately do so under penalty of perjury of the laws of the State of California.

2.   I am currently employed by the Ventura County Sheriff's Department as a sworn deputy.  I have been so employed continuously and full time since October 1, 1994, when I graduated from the Ventura County Criminal Justice Training Center.  I was promoted to the rank of senior deputy in July of 2000.

3.

4.   During that time, I was assigned to narcotics enforcement for five years.  I have testified as a narcotics expert in the Ventura Superior Court.  I have also testified in narcotics prosecutions in the Los Angeles Superior Court and in the federal district court.

5.   I have been involved in over 190 narcotics purchases and the writing and execution of search warrants for narcotics-related offenses.

6.   As a detective, I have had contact with dozens of narcotics users, dealers, and informants.  During my conversations with these individuals, I have gained an understanding of how drug

/ / /

1

DECLARATION OF

1  sales, drug manufacturing, drug smuggling, and other illicit parts

2  of the narcotics trade occur.

3      7.  Mail containers, such as manila envelopes, greeting

4  cards, and their envelopes, as well as conventional mail envelopes

5  and the papers which they contain, are being used to smuggle

6  narcotics and currency into custody facilities.

7      8.  Having had the smuggling techniques demonstrated to me,

8  and having had hands-on experience utilizing these techniques, it

9  is my belief that other contraband could also be smuggled into a

10 custodial facility using these same techniques.

11     9.  Such contraband could include metal wire, lithium,

12 gunpowder, and conceivably even plastic explosives.

13     10.  During the fourth week of October of last year, I inter-

14 viewed a confidential reliable informant (hereinafter referred to

15 as "CRI").  The purpose of this meeting was to discuss and to have

16 CRI demonstrate for me how the mail was being used to smuggle

17 contraband, especially narcotics, into custody facilities.

18     11.  Before my meeting with CRI, and with the permission of

19 the Ventura County Sheriff's Department, I obtained quantities of

20 crystal methamphetamine and tar heroin from the Sheriff's property

21 room (from adjudicated cases).  Using the actual heroin and meth-

22 amphetamine, I asked CRI to demonstrate different techniques which

23 CRI has used to conceal narcotics within the letters and envelopes.

24     12.  During CRI's demonstration, I had hands-on experience and

25 completed CRI's techniques for concealing the narcotics within

26 envelopes and letters.

27     13.

28

2

DECLARATION OF

1          (a)

2

3

4

5

6

7

8

9          (b)

10

11

12          (c)

13

14

15

16          (d)

17

18

19

20          (e)

21

22

23     14.

24

25     15.

26

27     16.

28

DECLARATION OF

1

2

3

4

5       17.   The methamphetamine was detectable using other scientific

6 means.

7      18.

8

9      (a)

10

11

12

13

14      (b)

15

16

17

18      (c)

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF

(d)

(e)

(f)

19.   Once concealed, I was personally unable to detect the heroin by feeling or manipulating the envelope.   The tar heroin was detectable by scientific means or by tearing the bottom flap of the envelope.

20.   During my discussions with informants in the past, I have learned about underground economies within custody facilities. These economies can compromise the security of the custody facility by placing inmates in positions of authority and influence over other inmates, by virtue of having valuable contraband, including U.S. currency.

21.   The currency in these economies includes paper money and other items of value, such as narcotics.   During my conversation with CRI, CRI told me that CRI had participated in these underground custody economies, using U.S. currency in the form of

/ / /

5

DECLARATION OF

1  paper money, almost always $100 bills, concealed within the flaps
2  of envelopes.
3       22.
4
5
6
7
8
9       I declare under penalty of perjury under the laws of the State
10 of California that the foregoing information is true and correct.
11      Executed this 22 day of February, 2011, at Ventura,
12 California.
13
14  _____
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6

DECLARATION OF

1  Re:  *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
   VCSC Case No. MA-004-11

2

3                    <u>DECLARATION OF AARON WILKINSON</u>

4       I, Aaron Wilkinson, declare as follows:

5       1.   I make this declaration of facts based upon information

6  which is personally known to me.  If called to testify as a witness

7  to the information contained in this declaration, I would compe-

8  tently and accurately do so under penalty of perjury of the laws of

9  the State of California.

10      2.   I am currently employed by the Ventura County Sheriff's

11  Department as a classification deputy.  I graduated from the

12  Ventura County Sheriff's Academy in September of 2006.  I have been

13  employed continuously and full time since then.  During that time

14  period, I have been assigned to the Pretrial Detention Facility.

15      3.   In my capacity as a classification deputy, I have

16  received training in intelligence gathering, criminal street gang

17  activity, and prison gang activity.  This training includes the

18  detection and evaluation of gang communications, prison politics,

19  and the use of symbols and codes (covert communications), which are

20  used by prisoners to avoid detection by jail staff.

21      4.   I have served as a classification deputy for approxi-

22  mately three yeas.  My assignment entails intelligence and infor-

23  mation gathering and evaluation, interviewing inmates, developing

24  confidential informants, and monitoring the overall activities and

25  conduct of those confined.

26      5.   As part of my responsibilities, I frequently interact

27  with inmates and conduct searches of their housing locations and

28  any area to which prisoners have access within the Ventura County

                                  1
                    _____
                    DECLARATION OF AARON WILKINSON

1    detention facilities.

2          6.    I also review incoming and outgoing mail, as allowed by

3    the Sheriff's Department's Policies and Procedures Manual.   This

4    practice is designed to detect contraband, in addition to items

5    prohibited by jail rules and policies.   It is also designed to

6    discover gang intelligence and intentions and to interdict gang

7    orders and directives which are intended to disrupt jail opera-

8    tions, assault inmates within our facilities, and/or intimidate

9    rival gang members as well as witnesses in criminal prosecutions.

10         7.    Many of the operations undertaken have resulted in the

11   detection of the types of messages described in the previous para-

12   graph, as well as attempts to coordinate testimony, order the

13   destruction of evidence in criminal prosecutions, and generally

14   confound criminal investigators.

15         8.    To illustrate the threats posed to the safety, security,

16   and orderly operation of our jail facilities, I provide the

17   following examples of contraband items discovered and gang intel-

18   ligence interdicted in the course of my responsibilities as a

19   deputy sheriff:

20         (a)

21

22

23

24

25

26

27

28

(b)   (1)   I have also discovered razor blades hidden in the flaps and creases of envelopes which are in prisoners' cells during these same cell searches.

(2)   These items pose a threat to the safety of the guards and inmates in our jail facility, not only because of their current possession by the inmate in custody, but also because it is commonplace for inmates to mail envelopes out of the facility to other inmates in higher security areas of the jail.  By "higher security," I mean inmates who pose increased security risks based upon their current charged crime or past criminal conduct and/or history.

9.   For all of the reasons stated in this declaration, I believe, based upon my training and experience as a classification deputy, that the ability to send sealed correspondence from within a locked detention facility greatly increased the likelihood that the jail environment would become vulnerable to violent attacks and criminal enterprises.

I declare under penalty of perjury under the laws of the State of California that the foregoing information is true and correct.

Executed this _SIXTH_ day of _MARCH_____, 2011, at Ventura, California.

AARON WILKINSON

3

DECLARATION OF AARON WILKINSON

Re: *In re Steven Garcia, et al. v. Chief Deputy David Tennessen*
VCSC Case No. MA-004-11

## DECLARATION OF JEFFREY HELD

I, Jeffrey Held, declare as follows:

1.   I am an attorney admitted to practice law before all the courts of the State of California.   I am employed as an attorney in the Law Offices of Alan E. Wisotsky, counsel of record for respondents Chief Deputy David Tennessen and Assistant Undersheriff Gary Pentis.

2.   I make this declaration based upon information which is personally known to me.   If called to testify as a witness to the information contained in this declaration, I would competently and truthfully do so under penalty of perjury of the laws of the State of California.

3.   On March 2, 2011, I personally researched multiple dictionary definitions of the word "letter," in the sense of correspondence.   I conducted this research by actually examining the hardbound dictionaries themselves and did not rely upon any secondary sources to inform my understanding of the standard meaning of the word "letter," in the sense of correspondence.

4.   According to the Random House Webster's Unabridged Dictionary (2d ed., 2001), the definition of a letter is "A written or printed communication addressed to a person or organization and usually transmitted by mail."   This definition appears on page 1104.   There is absolutely no reference to envelopes or sealed containers whatsoever.

5.   According to the Merriam-Webster's School Dictionary (no edition, 2004), the definition of a letter is "A written or printed

1

message addressed to a person or organization." This definition appears on page 546. There is no reference whatsoever to envelopes or sealed containers within which the communication might be enclosed.

6. According to the Concise Oxford English Dictionary (11th ed. rev., 2008), page 818, a letter is defined as "A written, typed or printed communication, sent by post or messenger." There is no reference whatsoever to envelopes or containers within which the communication might be enclosed.

7. According to the Oxford American Dictionary and Thesaurus (2d ed., 2009), page 745, a letter is defined as "A written, typed, or printed communication sent by mail or messenger." No reference whatsoever is made to envelopes or containers.

8. According to the 1995 edition of Merriam-Webster's Desk Dictionary, page 313, a letter means "A written or printed communication." No reference whatsoever is made to envelopes or containers.

9. According to Merriam-Webster's Collegiate Dictionary (11th ed.; 2009), page 713, a letter means "A direct or personal written or printed message addressed to a person or organization." There is no reference whatsoever to envelopes or containers.

10. According to the American Heritage Desk Dictionary (4th ed., 2003), page 487, a letter means "A written or printed communication." No reference whatsoever is made to envelopes or containers.

11. According to the New American Webster Handy College Dictionary (4th ed., 2006), page 419, a letter means "A written communication." No reference whatsoever is made to envelopes or containers.

2

DECLARATION OF JEFFREY HELD

12. Recent news coverage of smuggling of contraband into jails and prisons has indicated that the problem sought to be addressed by the Sheriff's Department's challenged mail policy is one of great proportion. Multiple standard news accounts on February 15, 2011, described a drug smuggling operation.

13. According to these news articles, five alleged members of a Yuba County-based white supremacist gang were arrested on February 14, 2011, on charges that they smuggled heroin into a state prison by hiding the drug in the glue strips of envelopes.

14. In November of 2010, prison officials, in conjunction with local police and the state Department of Justice, launched an investigation dubbed Operation Forseti, named after the mythical Norse god of justice. At that time, a Susanville prison guard noticed a suspicious envelope sent to an inmate who is a member of the New Order gang.

15. News accounts widely attributed a description of the operation to current Attorney General, Kamala Harris.

16. Attorney General Harris told news reporters that an analysis of an envelope revealed that its glue strip was laced with heroin.

17. The news accounts further stated that in January of 2011, investigators intercepted two more envelopes containing heroin sent to two New Order members housed in the Susanville prison.

18. These envelopes contained nearly a gram of heroin. A gram of heroin is worth $500 in prison, which is about five times the street value, according to Attorney General Harris.

19. Attorney General Harris was widely quoted in news accounts published on February 15, 2011, as having stated the

3

DECLARATION OF JEFFREY HELD

1  previous  day,  "Today's  operation  demonstrates  the  criminal

2  ingenuity of inmates and their associates outside of prison walls."

3      20.  News accounts stated that the five gang members were

4  charged with conspiracy to distribute heroin within a prison.  Five

5  inmates were also charged with a variety of violations.

6      21.  According to Attorney General Harris, the interdiction

7  and seizure of these drug-containing envelopes provided probable

8  cause to search seven locations in the Yuba City area.  During

9  those searches, two weapons, three grams of heroin, and a quarter

10  ounce of methamphetamine were confiscated.

11      I declare under penalty of perjury under the laws of the State

12  of California that the foregoing information is true and correct.

13  Executed this 9 TH day of March, 2011, at Ventura, California.

14

15  _____

16  JEFFREY HELD

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF JEFFREY HELD

STATE OF CALIFORNIA, COUNTY OF VENTURA:

I am employed in the County of Ventura, State of California. I am over the age of 18 and not a party to the within action; my business address is 300 Esplanade Drive, Suite 1500, Oxnard, California 93036.

On November _____, 2011, I served the foregoing document described as **NOTICE OF COMPLIANCE WITH COURT'S PARTIAL UNSEALING ORDER** on all interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Stephen P. Lipson, Public Defender         Attorneys for Petitioners
Michael C. McMahon, Chief Deputy
Office of the Public Defender
Hall of Justice, Room 207
800 South Victoria Avenue
Ventura, CA  93009

Ron Bamieh                 Attorneys for Real Party in Interest
Laura Cota
Bamieh & Erickson
692 E. Thompson Boulevard
Ventura, CA  93001

I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at Oxnard, California.

I am "readily familiar" with this firm's practice of collecting and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit.

Executed on November _____, 2011, at Oxnard, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
KYLE ROBSON

WISOTSKY, PROCTER, & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

3

NOTICE OF COMPLIANCE WITH COURT'S PARTIAL UNSEALING ORDER