ERNEST GALVAN – 196065
BLAKE THOMPSON – 255600
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:  egalvan@rbgg.com
        bthompson@rbgg.com

BRIAN A. VOGEL – 167413
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, California 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
Email: brian@bvogel.com

LANCE WEBER – Fla. Bar No. 104550*
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, Florida 33460
Telephone: (561) 360-2523
Facsimile: (866) 735-7136
Email: lweber@humanrightsdefensecenter.org

* Admitted to Practice *Pro Hac Vice*

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF VENTURA; GEOFF DEAN, GARY PENTIS, LINDA OKSNER, and RICK BARRIOS, in their individual and official capacities, DOES 1-10, in their individual and official capacities,<br><br>Defendants. | Case No. 14-0773-GHK (EX)<br><br>[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Judge: Hon. George H. King |

[1199477-2]

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter is before us on Plaintiff's Motion for Preliminary Injunction ("Motion"). We have considered the papers filed in support of and in opposition to the Motion and the Parties' arguments at the May 14 hearing. We have also considered Defendants' supplemental opposition and Plaintiff's response, which we granted the Parties leave to file after the May 14 hearing. [Dkt. No. 37]. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows:

## I. Background

On January 31, 2014, Prison Legal News ("PLN") filed this Section 1983 action against the County of Ventura, Sheriff Geoff Dean, Assistant Sheriff Gary Pentis, and Commanders Linda Oksner and Rick Barrios (collectively "Defendants" or "County") for alleged violations of its rights under the First and Fourteenth Amendments. It seeks declaratory and injunctive relief as well as damages.

*Prison Legal News* is a monthly magazine that provides information about legal news, prisoner rights, and other prison-related issues. (Wright Decl. ¶ 4). The Human Rights Defense Center, a nonprofit organization, has published *PLN* since 1990. (*Id.* ¶¶ 2, 6). PLN currently has approximately 9,000 subscribers, including prisoners in 2,200 correctional facilities. (*Id.*) PLN sends its subscribers monthly issues as well as renewal letters near the end of their subscriptions. (*Id.* ¶ 7). In addition, by request, PLN sends inmates an "informational brochure packet" that includes a subscription order form and information about the legal and self-help books distributed by the Human Rights Defense Center. (*Id.* ¶¶ 5, 8). PLN also sends this packet to inmates it identifies as potential subscribers. (*Id.* ¶ 8). Finally, PLN periodically sends inmates copies of case law printed from the internet to inform them of recent legal developments. (*Id.* ¶ 9). PLN distributes these publications and correspondence inside prisons to carry out its core mission of educating inmates about the criminal justice system and their legal rights. (*Id.* ¶¶ 2, 10).

PLN has sent publications and correspondence to inmates housed in the Ventura County jail facilities—the Pre-Trial Detention Facility, the Todd Road Jail, and the East County Jail—for many years. (*Id.* ¶ 18). These deliveries were carried out without incident until approximately February 2012, when the mailings began to be returned to PLN. (*Id.* ¶¶ 18-19). Since February 2012, at least 148 items sent to Ventura County inmates have been returned to PLN marked "Return to Sender," and additional PLN mailings have likely been rejected without being returned. (*Id.* ¶¶ 19-20). The County has not given PLN an opportunity to internally challenge or appeal its rejection of PLN's publications and correspondence. (*Id.*)

The undelivered mailings that have been returned to PLN have been ink stamped or labeled with various reasons for their rejection. At least 33 copies of the magazine have been returned for containing advertisements deemed "suggestive." (*Id.* ¶ 21). Subscription renewal letters and PLN's informational brochure packets have been returned for violating the County's postcard-only policy, under which "[p]ostcards [are] the only acceptable form of incoming mail." (*Id.* ¶¶ 22, 23, 28). On other occasions, these materials were returned with labels indicating that "inmates cannot order anything from jail." (*Id.* ¶¶ 22, 23). Finally, printouts of case law sent by PLN have sometimes been rejected for not complying with the postcard-only policy and have other times been rejected with the notation that "Xeroxed copies from books or internet not allowed." (*Id.* ¶ 24). These same two reasons have been used to reject printouts of articles from PLN's website that have been sent to Ventura County inmates by third parties. (*Id.* ¶ 25).

PLN alleges that Defendants' restrictive mail policies violate its First Amendment right to communicate with inmates. It further alleges that Defendants' practice of rejecting mail without providing notice and an opportunity to appeal violates its Fourteenth Amendment right to due process. Based on these alleged constitutional violations, PLN seeks to: (1) enjoin Defendants' postcard-only policy in full; (2) enjoin Defendants from rejecting correspondence without providing

written notice and an administrative appeal process; and (3) enjoin Defendants from rejecting its mailings for containing (a) "suggestive" content, (b) Xeroxed material, or (c) subscription order forms.

The County's postcard-only policy for incoming mail remains in full force and effect. However, Defendants maintain that the other policies and practices challenged by PLN have been "fully and permanently discontinued." (Opp. 23). Specifically, they contend that: (1) on April 6, 2012, the County rescinded its ban on material that is merely sexually suggestive (Barrios Decl. ¶ 22); (2) the County has ceased "the clerical practice" of giving "random reasons" for rejecting incoming mail when the actual reason for rejection is noncompliance with the postcard-only policy (Opp. 24, Flower Decl. ¶ 8, Barrios Decl. ¶ 23); and (3) as of March 24, 2014, the County provides notice of its internal appeal process to all senders of undelivered mail (Flowers Decl. ¶¶ 3-5, Barrios Decl. ¶ 21). Defendants argue that PLN's motion should be denied in full because (i) the County's postcard-only policy is constitutional, and (ii) PLN's motion is moot to the extent it seeks to enjoin discontinued policies and practices.

## II. Legal Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." (*Id.* at 20).

The Ninth Circuit has adopted a "sliding scale approach" under which "[a] preliminary injunction is appropriate" where there are "serious questions going to the merits . . . and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)

(internal citation and quotation marks omitted). Under this "serious questions" test, "a 'likelihood' of success per se is not an absolute requirement" to securing a preliminary injunction. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1086 (9th Cir. 2014), *petition for cert. filed*, 82 USLW 3624 (Apr. 11, 2014) (No. 13-1244). A stronger showing on the "balance of hardships element" may offset a lesser showing of "likelihood of success on the merits," so long as the other two elements of the *Winter* test are also met. *Alliance*, 632 F.3d at 1135. In other words, if the balance of hardships tips sharply in the plaintiff's favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, then a preliminary injunction may issue so long as the plaintiff shows there are "serious questions going to the merits." (*Id.*) Such "serious questions" are presented where the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### III. Analysis

#### A. Postcard-Only Policy

##### 1. Likelihood of Success on the Merits

To determine PLN's likelihood of success on the merits, we must assess the constitutionality of the County's postcard-only policy. The first step in this analysis is to "determine whether any First Amendment interest is implicated" by the County's ban on letter mail. *Hrdlicka v. Reniff*, 631 F.3d 1044, 1048 (9th Cir. 2011). "Publishers have a First Amendment right to communicate with prisoners by mail." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). Because the County's postcard-only policy directly affects PLN's ability to communicate with prisoners by mail, it implicates a well-established First Amendment interest. However, this First Amendment interest is "subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." (*Id.* (citation and internal quotation marks omitted).) Accordingly, the County's postcard-only policy will be upheld so long as

it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

We look to four factors to determine whether a prison regulation is "reasonably related to legitimate penological interests":

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective, (2) whether there are alternative avenues that remain open . . . to exercise the right, (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (citing *Turner*, 482 U.S. at 89-90). In applying this test, "[w]e are required to afford considerable deference to the expertise and decisionmaking of prison administrators." (*Id.*) At the same time, however, *Turner*'s "reasonableness standard is not toothless," *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989), and it "requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006). "[O]ur deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute." *Campbell v. Miller*, 787 F.2d 217, 227 n.17 (7th Cir. 1986).

        (i)    *Rational Relationship to Legitimate Penological Objective*

The first element of the *Turner* test requires us to (1) determine whether the governmental objective underlying the policy is legitimate and neutral; and (2) assess whether there is a rational relationship between the asserted government objective and the regulation. *Thornburg*, 490 U.S. at 414. If there is no valid, rational connection between the postcard-only policy and a legitimate penological interest, we need not reach the remaining *Turner* factors. *Hrdlicka*, 631 F.3d at

1051.

To satisfy the rational relationship requirement, the initial burden is on the County to set forth an "intuitive, common-sense connection" between its asserted objective and the postcard-only policy. *See Frost v. Symington*, 197 F.3d 348, 356 (9th Cir. 1999). Once done, the level of scrutiny we apply to this "common-sense connection" depends on the showing made by PLN. *Cook*, 238 F.3d at 1150. If PLN presents evidence that refutes the County's "common-sense connection," the County must "present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." (*Id.*) On the other hand, if PLN cannot rebut the "common-sense connection" proffered by the County, then we assume the first *Turner* factor is satisfied without inquiring into whether "the banned material actually caused problems in the past" or whether "the materials are 'likely' to cause problems in the future." *Cook*, 238 F.3d at 1150 (quoting *Mauro*, 188 F.3d at 1060).

Here, Defendants contend that there is "an intuitive, common-sense connection" between the postcard-only policy and interdicting the flow of contraband into the prison because drugs, weapons, currency, and keys can be hidden in the seams of envelopes, under postage stamps, and in between (and within) sheets of paper. However, John Clark, PLN's expert who has worked in corrections for 35 years (including 24 years at the Federal Bureau of Prisons), opines that the postcard-only policy is "contrary to widely accepted detention practices." (Clark Decl. ¶ 28). He explains that allowing inmates to receive letter mail actually does not pose any significant threat to security or safety because "staff persons who work in jail mailrooms have a variety of means by which they can detect and intercept contraband that might be sent to inmates inside envelopes through the mail." (*Id.* ¶ 29). The relevant comparison is therefore not an unrealistic "no inspection" policy, under which contraband could undoubtedly flow freely into the prison. *See Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d

1068, 1083 (D. Or. 2013) ("*Columba II*"). Instead, the postcard-only policy must be compared to the County's prior policy of subjecting incoming mail to a routine, industry-standard inspection. (*See id.*) When such a comparison is made, "the rational relationship between the postcard-only policy and enhancing security dissolves." (*Id.*)

The burden is therefore on the County to present sufficient evidence to show that the connection between its security objectives and the postcard-only policy "is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357. Defendants do not meet this burden because they fail to "offer *any* explanation why a postcard-only policy is more effective at preventing the introduction of contraband than opening envelopes and inspecting their contents." *Columbia II*, 942 F. Supp. 2d at 1083 (emphasis in original). Defendants do not suggest, for example, that inspecting letters does not reliably detect contraband. Instead, the County's own evidence shows that mail staff have successfully discovered and disposed of contraband that was concealed in the mail. (*See* Aguilar Decl. ¶¶ 4-10). Defendants also fail to offer evidence that the postcard-only policy has reduced the amount of contraband coming into the jail through the mail. Nor do they suggest that contraband cannot be smuggled via postcards. Indeed, many of the smuggling methods described by Defendants, including liquefying drugs into paper and concealing drugs under postage stamps, could be carried out just as easily with postcards as with letters.

Defendants attempt to discharge their burden by merely detailing the variety of ways in which contraband can be smuggled through the mail. But this evidence fails to demonstrate a rational connection between the postcard-only policy and prison security because it fails to address whether banning letters entirely (as opposed to simply inspecting them) meaningfully reduces the threat of contraband being introduced into the jail. *See Prison Legal News v. Columbia Cnty.*, 2012 WL 1936108, at *9 (D. Or. May 29, 2012) ("*Columbia I*") ("The Ninth Circuit has

frequently rejected claims that policies broadly prohibiting certain classes of mail have a rational relationship to enhancing security."). Defendants also offer evidence that jail officials found contraband in inmates' cells prior to the implementation of the postcard-only policy. This evidence is of little help to Defendants, however, because Defendants do not establish that this contraband entered the jail through the mail or that the amount of contraband found in inmates' cells has materially decreased under the postcard-only policy.

Based on the foregoing, the first *Turner* factor tips in PLN's favor. Given that contraband can be interdicted by inspecting all incoming mail, the connection between the postcard-only policy and the County's goal of reducing contraband is tenuous at best. While the postcard-only policy may theoretically reduce the risk of contraband entering the jail—simply because envelopes offer more creases and folds for smuggling, and no inspection system is foolproof—this mere theoretical possibility is insufficient to rebut PLN's evidence that letter mail does not pose a legitimate security threat. Absent any evidence that affirmatively shows that the postcard-only policy enhances jail security, we conclude the postcard-only policy smacks of arbitrariness and irrationality.[1] Although the first *Turner* factor is *sine qua non*, *Cook*, 238 F.3d at 1151, the remaining *Turner* factors confirm that the postcard-only policy is unconstitutional.

          (ii)   *Availability of Alternative Avenues for Exercise of Asserted Right*

The second *Turner* factor considers whether "other avenues remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90. In evaluating the

---

[1] Moreover, the County's postcard-only policy makes arbitrary exceptions. For example, the mail policy allows publishers to send inmates publications, even when the publications are sent in envelopes, while disallowing these same publishers from sending letters. At the May 14 hearing, defense counsel was unable to articulate any rational basis for this distinction.

second *Turner* factor, "the right in question must be viewed sensibly and expansively." *Mauro*, 188 F.3d at 1061. "[A]lternative means [of exercising the right] need not be ideal"; "they need only be available." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Defendants contend that the postcard-only policy has only "minimally" affected First Amendment rights. (Opp. 21). As support for this proposition, Defendants delineate the many forms of communication with the outside world that are available to inmates, including weekly visits from family and friends, phone calls, and emails. Defendants' argument is off the mark. In challenging the postcard-only policy, PLN asserts its own First Amendment rights (as well as the rights of other senders of mail), not the First Amendment rights of inmates. The relevant question, therefore, is not whether inmates have other avenues of communication available, but whether sufficient avenues of communication remain open to PLN (and other senders of mail).

While PLN remains able to send inmates monthly copies of its magazine,[2] under the postcard-only policy it is unable to send inmates subscription renewal letters, informational brochures, and printouts of recent case law. Defendants have not identified any alternative means by which PLN can reasonably send inmates informational brochures or printouts of recent case law. These forms of correspondence are simply not amenable to transmission on postcards. Even if they were, PLN does not have the staffing resources to print such voluminous information on postcards. And given that the jail charges between $1 and $2.50 for each page sent through the jail's email system, email is not a viable alternative for a small non-profit like PLN. (Wright Reply Decl. ¶ 5). Where, as here, the only

---

[2] As explained above, the County's mail policy permits publications sent directly from the publisher.

alternative avenues of communication are impractical or more costly, the second factor weighs against the legitimacy of the mail policy.³ *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001); *Clement v. Cal. Dept. of Corrections*, 220 F. Supp. 2d 1098, 1112 (N.D. Cal. 2002).

The postcard-only policy also drastically restricts the forms of correspondence that can be sent to inmates by friends, families, and other organizations. As the Oregon District Court summarized:

> It prevents an inmate's family from sending items such as photographs, children's report cards and drawings, and copies of bills, doctor reports, and spiritual and religious tracts. It prevents an inmate's friends and other correspondents from sending printed copies of articles published in newspapers, magazines, or the internet. It prevents educational, community, and religious organizations from sending lessons, book and periodical offers, and fundraising appeals. Finally, and perhaps most importantly, the postcard-only mail policy creates a hurdle to thoughtful and constructive written communication between an inmate and his or her unincarcerated family and friends.

---

³ That these forms of communication are practically foreclosed under the postcard-only policy is not an insubstantial hardship. PLN explains that the delivery of its informational brochures "is just as important as the publications themselves" (Reply 11), as they are the means by which it informs inmates of the publications and resources it offers. *See Hrdlicka*, 631 F.3d at 1054 ("[I]n practice, it is difficult to create a broad awareness of CJA among inmates in jails where, unlike in prisons, populations turn over quickly. . . . [M]any inmates will have left the jail before they can learn about the existence of CJA, request that it be sent to them, and then receive it."). The postcard-only policy therefore directly impedes PLN's ability to reach new subscribers and threatens its continued vitality. Similarly, in light of its mission to educate prisoners of their legal rights, PLN has a keen interest in sending recent case law quickly, when it is most relevant to inmates. (*See* Wright Decl. ¶ 11).

*Columbia I*, 2012 WL 1936108, at *10 (internal citations omitted).

In sum, although written correspondence is not completely foreclosed, this important avenue of communication is severely limited under the postcard-only policy. Accordingly, on balance, the second *Turner* factor favors PLN.

### (iii) Impact of Accommodating Right on Guards, Prisoners, and the Allocation of Prison Resources

Under the third *Turner* factor, we assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Given that "few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order," the third *Turner* factor weighs most heavily where "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or prison staff." (*Id.*)

Defendants contend that the inevitable consequence of allowing inmates to receive letters is "significantly less safety for everyone in the jail" because, without the postcard-policy, inmates will have "[u]nrestricted access" to contraband-filled mail containers. (Opp. 21). This is a disingenuous argument. If the County were to rescind its postcard-only ban, inmates would not suddenly have "unrestricted access to mail containers" filled with contraband—incoming mail would be inspected, and jail staff would dispose of any contraband.

Accordingly, the only likely impact of accommodating letter mail is that Defendants would have to implement a more expansive inspection system. Defendants have made no argument whatsoever that implementing such an inspection system would pose any significant administrative hurdles.[4] And it is

---

[4] Defendants' Supplemental Opposition does not address the administrative burdens of an inspection system generally. Instead, it focuses on the administrative feasability of a system in which envelopes are discarded before delivering mail to (footnote continued)

unlikely that they could plausibly make any such argument. PLN's expert opines that effective inspection systems are "not difficult to implement" and that they are used by correctional facilities throughout the country. (Clark Reply Decl. ¶¶ 3, 7; Clark Supp. Decl. ¶ 3). Furthermore, any time-savings afforded by the postcard-only policy is likely too modest to be of any significance, especially given that postcards must still be inspected. (*See* McAndrew Decl. ¶ 10 ("[T]he amount of additional time required to open an envelope would, at most, be very modest—somewhere in the range of two or three seconds."); Clark Supp. Decl. ¶¶ 3, 5 ("The minimal additional steps required for mail that comes in envelopes (opening the envelope, taking the items out of the envelope, and returning the items to the envelope after inspection) do not create a significant staffing burden.")); *Columbia II*, 942 F. Supp. 2d at 1086 ("[T]he time-savings afforded to the Jail by the postcard-only mail policy is *de minimis*."). In fact, because multiple postcards would have to be sent to communicate the same amount of information as a single letter, the postcard-only policy could actually *increase* the overall volume of mail. Ultimately, Defendants' silence on this point is damning. The County inspected letter mail for decades prior to implementing the postcard-only policy—it therefore has firsthand knowledge of the administrative burdens imposed by a letter-inspection system. Because Defendants have offered no evidence that the postcard-only policy has

---

inmates, a system adopted by a jail in Tennessee. While PLN offered the Tennessee jail's system as one potential alternative to a letter-ban, discarding envelopes is by no means the only way to interdict contraband. (Clark Supp. Decl. ¶ 3 ("[J]ails do not need to discard envelopes in order to achieve their security objectives. Jails and corrections departments around the country are able through routine inspection to detect contraband and deliver mail to inmates with envelopes included.")). If Defendants think that discarding envelopes would introduce too many logistical difficulties, Defendants can simply return items to their envelopes after they have been inspected, a procedure adopted by correctional facilities across the country. (*Id.* ¶¶ 3-4; McAndrews Supp. Decl. ¶¶ 10-11).

significantly reduced these administrative costs, we infer that the savings have been *de minimis*.

In sum, Defendants provide no credible evidence that rescinding the postcard-only policy would make the County's facilities less secure. Nor do they proffer evidence that inspecting letter mail would have a "significant ripple effect" on the allocation of resources. Accordingly, the third *Turner* factor supports the conclusion that the postcard-only policy unreasonably infringes PLN's First Amendment rights.

### (iv) Existence of Easy and Obvious Alternatives

The fourth and final *Turner* factor requires us to consider "whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." *Cook*, 238 F.3d at 1149. While *Turner* by no means requires that prisons always adopt the least restrictive alternative, "an alternative that fully accommodates the [asserted] right at *de minimis* cost to valid penological interests" is evidence that the policy does not satisfy *Turner*'s reasonable relationship standard. *Turner*, 482 U.S. at 90-91.

Here, a ready alternative to the County's outright ban on letters exists: inspecting all incoming mail for contraband. As explained above, Defendants have made no showing that implementing an inspection system would impose any inordinate safety or administrative costs. That the Federal Bureau of Prisons as well as state correctional systems across the country have been able to accommodate letter mail without compromising security also suggests that the County's postcard-only policy is an exaggerated response. (Clark Reply Decl. ¶ 7); *see Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir. 2001) (noting that "the policies followed at other well-run institutions" can serve as evidence that an easy and obvious alternative exists); *Columbia I*, 2012 WL 1936108, at *12 (concluding that the many correctional facilities that permit letters constitute "further evidence that opening and inspecting letters is an easy and obvious alternative to [a] postcard-only mail

policy"). Accordingly, the final *Turner* factor suggests that the postcard-only policy impermissibly infringes on PLN's (and other third parties') First Amendment right to correspond with Ventura County inmates.

Based on the foregoing, all of the *Turner* factors weigh in PLN's favor. Accordingly, we conclude that PLN is likely to succeed on the merits with respect to its First Amendment claim.[5]

---

[5] Defendants cite a few cases in which similar policies have been upheld to support their argument that PLN is unlikely to prevail on the merits: *Prison Legal News v. Babeau*, 933 F. Supp. 2d 1188 (D. Ariz. 2013); *Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Ariz. 2009); and *In re Garcia*, Case No. MA-004-11 (Ventura County Superior Court). None of these cases dictates that PLN is not likely to succeed on the merits. To the extent they do, we decline to follow them.

First, *Babeau* can be readily distinguished because the challenged policy was less restrictive than the County's postcard-only policy. In *Babeau*, the jail allowed letters so long as they were limited to a single page. *Covell* is similarly distinguishable. The jail in *Covell* limited incoming mail to metered postcards because it had experienced an increase in contraband smuggling via the back of postage stamps. By contrast, stamps are not at issue here because they are permitted under the County's postcard-only policy. *See Columbia I*, 2012 WL 1936108, at *9 n.7 (concluding that *Covell* lacked precedential value in case where defendants had "not pressed the same argument"). More importantly, the defendant in *Covell* offered specific evidence that banning stamped mail had decreased the likelihood of contraband being smuggled into the jail. Defendants here have made no such showing with respect to the postcard-only policy. Finally, Defendants put a lot of weight on the fact that the Ventura County Superior Court sanctioned the very same policy that is challenged here. However, the Superior Court's analysis is far too summary to be persuasive. Moreover, even though the cases cited by Defendants have upheld similar policies to the one at-issue here, other cases have concluded that postcard-only policies are unconstitutional. *See, e.g., Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068 (D. Or. 2013); *Prison Legal News v. Spokane Cnty*, CV-11-029, Dkt. No. 109 at 7 (E.D. Wa. Aug. 3, 2011); *Hamilton v. Hall*, 790 F. Supp. 2d 1368 (N.D. Fla. 2011) (denying motion to dismiss a challenge to jail's postcard-only policy).

### 2. Likelihood of Irreparable Harm

Defendants make no argument with respect to the remaining prongs of the preliminary injunction test. In any event, it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009). Accordingly, PLN has sufficiently established that the County's postcard-only policy presents a likelihood of irreparable harm.

### 3. Balance of Equities

Given that the County has accepted letter mail in the past, and absent any showing that reverting to this prior policy would cause any undue harm, we conclude that rescinding the postcard-only policy would not impose an inordinate hardship on the County. Accordingly, the balance of equities tips in PLN's favor. *See Columbia I*, 2012 WL 1936108, at *12. ("The constitutional hardship is greater than the modest impact on Defendants' time and resources.").

### 4. Public Interest

"The public interest inquiry primarily addresses [the] impact on non-parties . . . ." *Sammartino v. First Judicial Dist. Court, in and for Cnty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated in part on other grounds by Winter*, 555 U.S. at 24. Here, this factor favors PLN not only because of the public's general interest in "upholding free speech principles," but also because an injunction would directly benefit members of the public who wish to send written correspondence to Ventura County inmates. *Klein*, 584 F.3d at 1208; *see also Columbia I*, 2012 WL 1936108, at *12 ("A court order enjoining Defendants from enforcing the postcard-only mail policy will permit non-party members of the public to more easily communicate with inmates.").

///

///

///

### B. Purportedly Discontinued Policies and Practices

Defendants do not defend the constitutionality of the remaining practices challenged by PLN.[6] While conceding that these practices were unconstitutional, they assert that an injunction need not issue because these practices have been "fully and permanently discontinued." They insist that their voluntary cessation of these practices vitiates Article III jurisdiction. We disagree.

This is a case that falls squarely within the voluntary cessation exception to the mootness doctrine. *See Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). Defendants have failed to satisfy their "heavy burden" to show "that the challenged conduct cannot reasonably be expected to start up again." (*Id.*) They instead expect their "protestations of repentance and reform" to assure us that they will not return to past practices. *See U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953). Mere promises are insufficient to discharge their burden, however, particularly given that Defendants admit that mail staff have failed to comply with policy directives in the past. For example, although Defendants' official policy has been to provide notice to senders of rejected mail since April 6, 2012, in practice such notice has not been provided. (Barrios Decl. ¶ 21). Similarly, even though Defendants rescinded their ban on suggestive content on April 6, 2012, items were still being rejected on this basis after April 6, 2012. (*See* Wright Decl. Ex. G). Finally, Defendants' assurance that the practice of giving incorrect reasons for rejecting mail has been rectified is of little comfort in light of their admission that

---

[6] Despite Defendants' admission that these past practices fail to pass constitutional muster, we have nevertheless subjected these practices to our own analysis and conclude that a preliminary injunction is appropriate given all relevant factors and requirements.

staff have previously rejected mail for "random reasons." (Flowers Decl. ¶ 8). Accordingly, without a sufficient showing that there is no longer any threat of continuing constitutional violations, a court order is necessary to ensure that Defendants will not revert to their past practices.

## IV. Conclusion

Plaintiff's Motion is **GRANTED** in full. We exercise our discretion to waive the bond requirement in light of PLN's limited financial resources. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2004).

## ORDER

1. It is HEREBY ORDERED that Defendant County of Ventura (the "County") and individual Defendants DEAN, PENTIS, OKSNER, and BARRIOS, and their successors, officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise (hereinafter referred to collectively as "Defendants"), SHALL suspend enforcement of the postcard-only policy for incoming mail no later than June 19, 2014. Defendants shall not refuse to deliver correspondence sent to inmates at the County's jails on the ground that correspondence is not written on a postcard.

2. IT IS FURTHER ORDERED that Defendants SHALL NOT refuse to deliver correspondence, catalogs or subscription order forms to inmates at the Jail on the basis that inmates cannot order subscriptions or other materials.

3. IT IS FURTHER ORDERED that Defendants SHALL NOT refuse to deliver correspondence to inmates at the Jail on the basis that the materials were Xeroxed, photocopied or printed from the Internet.

4. IT IS FURTHER ORDERED that Defendants SHALL NOT refuse to deliver copies of publications from Plaintiff or other publishers on account of sexually "suggestive" content unless the publication contains actual nudity or graphic depictions of sexual acts.

5. It is FURTHER ORDERED that Defendants shall provide written notice and an administrative appeal process to senders and inmates when Defendants refuse to deliver publications and correspondence to inmates at the County's jails. Within 30 days of issuance of this order, the parties shall confer regarding the specific policy, procedure and forms for providing notice and an appeal process.

6. IT IS FURTHER ORDERED that the bond requirement is waived.

7. No person who has notice of this injunction shall fail to comply with it, nor shall any person subvert the injunction by any sham, indirection or other artifice.

DATED: 6/16, 2014

_____
Hon. George H. King
United States District Judge

[1199477-2]

18

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION